243 P.3d 352 (2010)
STATE of Kansas, Appellee,
v.
Jesus BERRIOZABAL, Appellant.
No. 100,291.
Supreme Court of Kansas.
December 10, 2010.
*358 Christina M. Waugh, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.
Ellen Mitchell, County Attorney, and David Lowden, Sedgwick County Assistant District Attorney, argued the cause, and Christine Trocheck, Assistant County Attorney, Ellen Mitchell, County Attorney, and Steve Six, Attorney General, were on the briefs for appellee.
The opinion of the court was delivered by LUCKERT, J.:
Appealing from jury convictions of one count of rape, one count of attempted rape, and two counts of aggravated criminal sodomy, Jesus Berriozabal argues his convictions should be reversed because the district court erred by admitting evidence of prior uncharged sexual conduct between Berriozabal and the complaining witness, by denying his motion for a psychological examination of the complaining witness, and by excluding evidence that the complaining witness had been sexually abused by a relative. In addition, he argues his two hard 25 life sentences constitute cruel and unusual punishment and that he was improperly sentenced to a hard 25 life sentence for attempted rape.
We reject Berriozabal's attacks on his convictions, finding he failed to preserve the K.S.A. 60-455 issue, to establish a compelling reason for the psychological examination of the complaining witness, or to establish that the district court abused its discretion in determining the evidence of alleged prior sexual abuse should not be admitted. However, we vacate Berriozabal's sentences on both the rape and attempted rape counts. The life sentence based on the rape conviction is vacated because the district court did not make the necessary factual findings to allow appellate review of Berriozabal's argument that a life sentence would violate the cruel and/or unusual punishment provisions of § 9 of the Kansas Constitution Bill of Rights or the Eighth Amendment to the United States Constitution. The sentence based on the attempted rape conviction is vacated because it is contrary to our holding in State v. Horn, 288 Kan. 690, 206 P.3d 526 (2009), which held that the rule of lenity requires imposing the lesser of two sentences that apply to an attempt to commit a sexually violent off-grid crime against a minor, such as rapei.e., K.S.A. 21-3301(c) ("An attempt to commit an off-grid felony shall be ranked at nondrug severity level 1.") and K.S.A. 21-4643(a)(1)(G) (hard 25 life imprisonment applies to "an attempt" to commit any of the sexually violent crimes enumerated in Jessica's law).
Hence, we affirm his convictions, vacate his sentences for the rape and attempted rape convictions, and remand for additional findings and for resentencing on the rape and attempted rape counts.

FACTS AND PROCEDURAL BACKGROUND
The defendant, Jesus Berriozabal, and his girlfriend B.H. met in 2003 and started living together the following year. B.H.'s daughter M.V. moved into the couple's residence in mid-2005, when M.V. was almost 11 years old. B.H.'s other daughter, C.H., came to stay for the summer of 2006, and the two girls shared a bedroom. The girls had previously *359 lived with their maternal grandmother because of B.H.'s drug addiction problems.
C.H. testified that on July 7, 2006, she left the house to go grocery shopping with her mother but came back inside to ask M.V. if she wanted anything from the store. When she got inside the house, C.H. discovered Berriozabal on top of M.V. in the master bedroom. Berriozabal was naked, with his pants around his ankles. M.V. was still in a dress. When Berriozabal saw C.H., he said, "Oh, shit," and jumped to his feet. C.H. told her mother, who confronted Berriozabal. He denied any sexual contact with M.V.
That afternoon, Berriozabal traveled to Mexico to visit his ailing father. Although he had previously discussed waiting until August and taking B.H. and M.V. with him, he left abruptly on July 7, taking only two pairs of jeans and one shirt and without making any arrangements to take a leave of absence from his employer. Berriozabal called B.H.'s cell phone and told her he was leaving the country.
Meanwhile, on the advice of her own mother, B.H. and her daughters went to the hospital, where M.V. was examined by a sexual assault nurse examiner. M.V. told the nurse that Berriozabal was trying to get on top of her when C.H. came home and that "I'm always on my back in his room." This prompted the nurse to ask if this had happened once or more frequently. M.V. told the nurse that this would happen "[e]verytime my mom and my sister go to the store,... unless they're going somewhere nearby the home." Berriozabal would usually take off M.V.'s clothes, too, but this time "he didn't get mine off yet, `cause my sister came in just after they had left."
M.V. indicated to the nurse that Berriozabal had touched "my cookie," pointing to her groin area, with his penis ("wee wee") and his hands. He also tried to put her hand on his penis, and she said he had previously put his penis in her mouth and put his mouth on her vagina. M.V. indicated that she experienced soreness and bleeding after incidents with Berriozabal.
The State charged Berriozabal with rape, attempted rape, and two counts of aggravated criminal sodomy. Sometime after July 7, 2006, B.H. contacted Berriozabal at the request of law enforcement and asked him to return from Mexico. She attempted to coax his return by telling him the charges had been dropped. Berriozabal returned and was arrested on the charges.
Before trial, the State filed a motion pursuant to K.S.A. 60-455 to present evidence of Berriozabal's prior uncharged sexual conduct with M.V. The court held a hearing at which the State presented the testimony of M.V. and Investigator Shawn Moreland of the Salina Police Department.
At the hearing, Investigator Moreland testified that when he interviewed M.V., she identified the female genitals and the male genitals as the "lower areas." M.V. told Moreland that Berriozabal had touched her on multiple occasions, but she was only able to identify two dates, specifically, July 4, 2006, and July 7, 2006. She indicated that Berriozabal had put his penis ("lower area") into her vagina ("lower area"). She also described Berriozabal's putting his mouth on her vagina and making her put her mouth on his penis.
M.V. also testified at the hearing, stating that when her mother was working or shopping, Berriozabal touched her in an inappropriate manner. He would make M.V. stay home while her mother went to the store, and he told M.V. not to tell anyone about the incidents. According to M.V., the touching started after Christmas of 2005. M.V. described how, in his bedroom, Berriozabal touched her with his hands and his "lower area." She also said he put his "lower area" inside of her "lower area." And M.V. indicated that the touching occurred more than 10 times. She testified that she did not tell anyone because she was scared.
The district court granted the State's motion to admit evidence of Berriozabal's prior sexual contact with M.V. The court noted that M.V. testified the touching occurred almost every day, that only Berriozabal and M.V. were in the home when the touching occurred, that M.V. was "very graphic in her description," and that M.V. was "sure that there had been a penetration." The district court noted that M.V.'s testimony was consistent. *360 The district court further observed that the State was not trying to introduce evidence of Berriozabal's committing similar acts with other individuals. In addition, the court ruled that the prior crimes testimony was admissible, specifically stating the evidence was relevant and would prove material facts. Reviewing and discussing the various reasons delineated in K.S.A. 60-455 as permissible reasons for admitting the evidence, the court found the evidence material to the issues of motive, opportunity, intent, preparation, and plan. Finally the court found that the probative value of the evidence outweighed the potential for prejudice.
Pretrial motions were also filed by Berriozabal. In one, filed under seal, Berriozabal asked the district court for a psychological examination of M.V. The reasons presented by Berriozabal included the instability of M.V.'s family, possible prior sexual abuse of M.V. by the brother of B.H.'s stepfather, and the "potential lack of veracity" on the part of M.V. In his written motion to support his claim that M.V. was untruthful, Berriozabal pointed to the fact that C.H. had testified at the preliminary hearing that M.V. initially denied the veracity of the sex offense charges against Berriozabal.
Berriozabal also filed, under seal, a motion to admit evidence of M.V.'s prior sexual behavior under the Kansas rape shield statute, K.S.A. 21-3525. Specifically, Berriozabal mentioned the alleged incident between M.V. and the brother of B.H.'s stepfather; M.V.'s discussing some sex education material from her school; and M.V.'s statement where she allegedly lied about another girlBerriozabal's former stepdaughter A.U.having sex with a boy named "Kevin."
At the hearing on these defense motions, Berriozabal testified that M.V. told him a "secret"she cried and told him about an incident where a person named Eddie "forced her to go to bed." She did not divulge any further details. When Berriozabal asked M.V. if she had told her mother or her grandmother, she said she had not done so because "[n]obody would believe her, nobody really liked her." Berriozabal also testified that he asked B.H. who Eddie was and was told he was a brother of B.H.'s stepfather. At various points in the record, the attorneys referred to Eddie as M.V.'s uncle or great uncle.
Berriozabal also testified regarding the other evidence he wished to see admitted. He reported that M.V. talked to B.H. about some information she learned in sex education class, like private parts. Berriozabal acknowledged at the hearing that he was unaware of any instance where M.V. had made a false accusation concerning sexual conduct against another person.
The defense also called A.U.'s mother and A.U. to testify at the hearing. A.U.'s mother claimed that M.V. had told other girls that A.U. was not a "virgin." A.U., 14 years old, gave similar testimony. She indicated that M.V. told B.H. that A.U. was not a virgin, and B.H. told A.U.'s sister. The news spread to A.U.'s mother, who confronted A.U. about the matter. A.U. admitted that her mother and M.V.'s mother did not get along very well, but she did not know why M.V. talked about A.U.'s virginity.
After hearing the evidence, the district court denied both motions. With regard to Berriozabal's motion to admit evidence of M.V.'s prior sexual behavior, the district court found that the hearing testimony by Berriozabal about Eddie did not provide a clear sexual connotation to the "go to bed" language. Further, the court found there was no "compelling presentation of prior acts on the part of the victim in this case involving someone else ... of a sexual nature." The court also found there was nothing in the record to suggest that M.V.'s attendance at a school sex education class led her to make sexual allegations against others. In addition, the court found the allegation regarding A.U. to be irrelevant.
As for the motion for a psychological examination of M.V., the district court acknowledged that M.V. had attended eight different schools and lacked parental stability. Nevertheless, the district court found there was no evidence that M.V. had required counseling and no indication that she was unstable "as to her truth or veracity." The only indicator of "some lack of veracity," the district court found, was the allegation about A.U.'s loss of *361 virginity. Even so, there was no direct testimony from any of the girls present when M.V. allegedly began the rumor about A.U.'s loss of virginity, nor did B.H. testify that her daughter had made such statements to her. The court also stated that it did not appear M.V.'s testimony at prior hearings was "in any way dishonest," and it did not appear she was unable to understand the meaning of her oath and the obligation to tell the truth. The court ultimately concluded there was no compelling need to submit M.V. to a psychological examination.
Ten days after the motions hearing, the district court conducted another hearing after Berriozabal filed a supplemental rape shield statute affidavit. At the hearing, the defense played a recorded conversation between A.U. and an investigator from the Salina Public Defender's Office. In the tape recording, A.U. told the investigator that during a sleepover M.V. had mentioned that M.V. was not a virgin because she had been raped by an uncle. A.U. could not remember any further details and could not remember the uncle's name.
The State called M.V. to testify at the hearing. M.V. indicated that she did not have a close relationship with A.U. and that A.U. had only spent the night once at her house in Salina. M.V. denied telling A.U. or Berriozabal that she had been raped by an uncle, and she denied knowing a person named "Eddie." According to M.V., A.U. said she (A.U.) was not a virgin, and A.U.'s mother found a journal in which A.U. admitted her loss of virginity.
Defense counsel argued that this evidence was relevant to M.V.'s credibility and relevant to explain the possible old injury revealed during M.V.'s sexual assault examination at the hospital. The district court denied Berriozabal's motion, finding the proposed evidence of prior sexual conduct of M.V. did not rise to the level of being "verifiable or relevant" to the issues before the jury.
At trial, defense counsel renewed the motion to admit evidence of M.V.'s prior sexual behavior after Mary Alice Weed, a sexual assault nurse examiner, testified that M.V. denied any "history" of being sexually abused by anyone other than Berriozabal. The district court found that under the totality of the circumstances, Berriozabal was only permitted to produce limited testimony relative to the alleged conversation between A.U. and M.V. about virginity, as it related to M.V.
M.V.'s trial testimony largely repeated the details of Berriozabal's sexual conduct which she had described at the pretrial hearings. On the diagram of a nude male, she identified the penis as the "lower area," and on a diagram of a nude female, she identified the breasts as the "upper area" and the vagina as the "lower area." She identified two specific dates, July 4, 2006, and July 7, 2006, involving sexual contact with Berriozabal. M.V. testified that on July 4, 2006, B.H. and C.H. left the residence to go shopping, and she stayed home with Berriozabal. While her mother and sister were gone, Berriozabal "put his lower area inside mine." This happened in Berriozabal's bedroom. She was not certain, but she also thought he made her put her mouth on his "lower area."
M.V. testified that on July 7, 2006, B.H. and C.H. again left the residence to go shopping, and "[h]e made me go into his room and he pulled down his pants and lifted up my dress." She said Berriozabal pulled down her underwear and "put his lower area in mine." Then C.H. came into the house. M.V. did not recall telling Investigator Moreland that Berriozabal was not able to put his "lower area" into her "lower area." According to M.V., her sister walked in, and Berriozabal said, "Oh, shit." M.V. then went to the bathroom, while C.H. went outside to get their mother.
After stopping at the grocery store with the girls, B.H. took them to the hospital. M.V. testified that she heard her mother call Berriozabal and told him they were going to the hospital. As for the trip to Mexico, M.V. testified that Berriozabal was not planning to go until August or September 2006, after B.H. got "settlement" money from her previous employer. This was confirmed by B.H. Both M.V. and B.H. denied that there was any specific arrangement to leave for Mexico on July 7, 2006.
*362 A jury convicted Berriozabal of one count of rape (K.S.A. 21-3502[a][2]), one count of attempted rape (K.S.A. 21-3301 and K.S.A. 21-3502[a][2]), and two counts of aggravated criminal sodomy (K.S.A. 21-3506[a][1]). Pursuant to Jessica's Law, K.S.A.2006 Supp. 21-4643, Berriozabal received two hard 25 life sentences, to be served consecutively, for the rape and attempted rape convictions. The court imposed a total of 330 months' incarceration for the aggravated criminal sodomy convictions, to run consecutive to the hard 25 life sentences.
Berriozabal now appeals. This court's jurisdiction is under K.S.A. 22-3601(b)(1) (off-grid crime).
Further facts will be presented as necessary for the analysis.

K.S.A. 60-455 EVIDENCE
Berriozabal first contends the district court erred by admitting evidence of his prior uncharged sexual conduct with M.V. However, Berriozabal did not object to the evidence when it was admitted during trial and did not request a standing objection or otherwise preserve his pretrial objections. Nor did Berriozabal raise any objection to the limiting jury instruction, which instructed the jury that it could consider the defendant's prior conduct "solely for the purpose of proving the defendant's motive, opportunity, intent, preparation, plan, knowledge, the relationship between the parties, or a continuing course of conduct." Berriozabal did not argue that the instruction was erroneous in his brief before this court, although that issue was discussed at oral argument. Where the appellant fails to brief an issue, that issue is waived or abandoned. Mid-Continent Specialists, Inc. v. Capital Homes, 279 Kan. 178, 191, 106 P.3d 483 (2005).
Although Berriozabal challenged the admission of the K.S.A. 60-455 evidence at the pretrial motion hearing, K.S.A. 60-404 requires a "timely" and specific objection to the admission of evidence, which this court has held means that a pretrial objection must be contemporaneously renewed during trial or preserved through a standing objection. See, e.g., State v. Wright, 290 Kan. 194, 207, 224 P.3d 1159 (2010); State v. Richmond, 289 Kan. 419, 428-30, 212 P.3d 165 (2009); State v. King, 288 Kan. 333, 340, 204 P.3d 585 (2009).
In this case, not only did Berriozabal fail to object at trial, the defense utilized the evidence as part of its strategy of discrediting M.V. Beginning with the defense's opening statement and continuing with the questioning of various witnesses, the defense developed a theme that M.V.'s version was unbelievable because, if there had actually been sexual contact as often and for the period that M.V. reported, there would have been clues that others would have observed. Counsel questioned witnesses about subjects such as whether M.V. reported Berriozabal's actions and whether there was a change in her behavior or attitude. Questions were posed to B.H. that elicited testimony that M.V. sometimes asked to stay home when B.H. went to the store and, at other times, did not object when left behind. This defense strategy is inconsistent with the argument Berriozabal asserts on appeal.
Accordingly, the issue of error in admitting K.S.A. 60-455 evidence was not preserved, and we do not reach the merits of Berriozabal's arguments.

PSYCHOLOGICAL EXAMINATION OF VICTIM
Next, Berriozabal argues that the district court abused its discretion by denying his motion for a psychological examination of M.V. We reject his arguments.

Standard of Review
The standard of review of a defendant's motion for a psychological examination of a complaining witness in a sex crime case is whether the district court abused its discretion in denying the request. State v. Price, 275 Kan. 78, 83, 61 P.3d 676 (2003); State v. Rucker, 267 Kan. 816, 821, 987 P.2d 1080 (1999). In general, a defendant is entitled to a psychological examination of a complaining witness on a showing of compelling circumstances that would justify such an examination. State v. Gregg, 226 Kan. 481, 489, 602 P.2d 85 (1979).
*363 A determination of whether such compelling circumstances exist requires examination of the totality of the circumstances in the case, with the following nonexclusive list of factors to be considered:
(1) whether there was corroborating evidence of the complaining witness' version of the facts,
(2) whether the complaining witness demonstrates mental instability,
(3) whether the complaining witness demonstrates a lack of veracity,
(4) whether similar charges by the complaining witness against others are proven to be false,
(5) whether the defendant's motion for a psychological evaluation of the complaining witness appears to be a fishing expedition, and
(6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth.
Price, 275 Kan. at 84, 61 P.3d 676; Gregg, 226 Kan. at 490, 602 P.2d 85; c.f., State v. McIntosh, 274 Kan. 939, 955, 58 P.3d 716 (2002) (motion for independent physical examination). These factors involve demonstrable evidence of a mental condition that requires further investigation, not the mere allegation of some untoward mental condition. Thus, the mere allegation of mental instability does not support the ordering of a psychological evaluation absent some real evidence. Likewise, the fact that a complaining witness may make inconsistent statements from time to time does not compel a mental evaluation of the witness. Gregg further suggests that it is rarely an abuse of discretion for a district court to fail to order a psychological examination. Gregg, 226 Kan. at 489, 602 P.2d 85.

Analysis of Factors
The parties focus on the Price factors; neither suggests that there is a relevant, additional factor to be considered in this case. Discussing the factors, Berriozabal agrees with the district court's finding that two of the factorsthe fourth (whether similar charges by the victim against others are proven to be false) and the sixth (whether the victim provides an unusual response when questioned about his or her understanding of what it means to tell the truth) are not applicable to this case. In addition, Berriozabal points out that the district court did not believe that, by asking for a psychological examination of M.V., defense counsel was conducting a fishing expedition (the fifth Price factor). Berriozabal disagrees with the district court's conclusion that the three other factorsthe victim's mental instability, the victim's lack of veracity, and possible past sexual abuse suffered by the victim were not applicable in this case.
Berriozabal first focuses on the mental instability factor. He points to the lack of a stable home environment for M.V., in that she had attended multiple elementary schools and lived with her grandmother most of the time because of her mother's drug addiction problems. He contends that "[t]his had to have some adverse effect on the mental stability of M.V." Yet, as aptly found by the district court, although there is evidence of an unstable home environment, Berriozabal presented no evidence of any mental instability on the part of M.V.
Berriozabal also attacks the veracity of M.V., contending that M.V.'s veracity came into question when she denied having made a statement about A.U.'s virginity but others testified that M.V. told her mother, B.H., that A.U. was not a virgin. The district court found that while this one incident indicated "some lack of veracity," the testimony on the matter was confusing and this incident did not present a compelling reason to require M.V. to submit to a psychological examination.
Finally, Berriozabal contends that his motion for a psychological examination of M.V. should have been granted because of the possibility that M.V. had been sexually abused by Eddie, the brother of B.H.'s stepfather. However, there was merely an alleged statement by M.V. to Berriozabal that Eddie forced M.V. "to go to bed." The district court did not find this accusation to be a compelling reason for ordering a psychological examination of M.V. in that there was no clear sexual connotation in the alleged statement, and M.V. denied any sexual abuse by a *364 relative and further denied knowing anyone named Eddie.
Contrary to Berriozabal's arguments, a review of Kansas cases leads to the conclusion that the district court did not abuse its discretion in determining that Berriozabal did not present compelling reasons justifying an order for a psychological examination of M.V. One example is State v. Gregg, 226 Kan. 481, 602 P.2d 85, where the defendant was convicted of aggravated sodomy and aggravated indecent solicitation of a child arising from two incidents involving Gregg and the complaining witness, an 8-year-old girl. This court affirmed the district court's denial of the defendant's motion for a psychological examination of the victim.
In Gregg, the factors urged by the defendant in support of the examination were the victim's age, the seriousness of the crime, and a shortage of corroborating evidence at trial. The Gregg court noted that the defendant did not introduce facts "as to the child's mental instability, lack of veracity, similar charges against other men proven to be false, or any other reason why this particular child should be required to submit to such an examination." Gregg, 226 Kan. at 490, 602 P.2d 85. The Gregg court concluded that the defendant's motion was "a fishing expedition embarked upon in the hope something damaging and admissible in the trial would be unearthed." Gregg, 226 Kan. at 490, 602 P.2d 85.
In another case, State v. Blackmore, 15 Kan.App.2d 539, 811 P.2d 54 (1991), aff'd in part and rev'd in part, 249 Kan. 668, 822 P.2d 49 (1991), the Court of Appeals rejected the defendant's argument that the district court erred in denying his motion to order an independent psychiatric examination of the complaining witness. The complaining witness had behavior problems, requiring treatment at a mental health center: "Jacob's problematic behavior included hyperactivity, sleeplessness, bowel movements in his pants, and gagging himself at night until he vomited. Jacob also experienced an episode of rectal bleeding from a tear which his grandmother attributed to constipation." Blackmore, 15 Kan.App.2d at 540, 811 P.2d 54. A physical examination of the victim did not reveal any physical evidence of abuse. Blackmore, 15 Kan.App.2d at 541, 811 P.2d 54. The Court of Appeals concluded with the following analysis:
"Not unlike Gregg, the record of testimony at trial contains no evidence that the complaining witness was mentally unstable or lacked veracity. There was no evidence that the complaining witness had made similar charges against other men that were proven to be false. While the complaining witness took medication as needed for earaches and asthma, there is no showing that the medication affected his veracity or mental stability. This evidence alone supports the trial court's denial and, while defendant advances other contentions regarding the examination, it cannot be said that the trial court abused its discretion." Blackmore, 15 Kan.App.2d at 542, 811 P.2d 54.
On review, this court affirmed the Court of Appeals on this issue, emphasizing that the defendant's failure to include a transcript of the preliminary hearing meant his veracity argument based on differences in the victim's testimony at the two hearings could not be examined. State v. Blackmore, 249 Kan. 668, 670, 822 P.2d 49 (1991).
Finally, in State v. Lavery, 19 Kan.App.2d 673, 877 P.2d 443, rev. denied 253 Kan. 862 (1993), the Court of Appeals found that the district court did not abuse its discretion in denying the defendant's motion to compel the complaining witness to undergo a psychiatric examination. The Lavery court reasoned:
"Lavery's motion contended that K.R. had been inappropriately exposed to sex and that she was using that knowledge to falsely accuse him. He presented evidence that K.R. was unsupervised most of the summer, used foul language, was possibly sexually molested by Ronnie Forth, another individual in the neighborhood, and had told a false story about killers in the school basement to two neighborhood girls. The court also noted there was an episode of K.R. `playing doctor' with other neighborhood children.
"In making its decision, the court reviewed all the testimony presented and found there was no evidence presented *365 which would tend to indicate that K.R. was using any knowledge of sexual activity she may have gained through sexual conduct with Forth to fabricate an allegation against Lavery. The court stated the lack of supervision and use of vulgar language did not indicate any kind of mental aberration, flight of fancy, or a lack of truth or veracity. The court concluded that, taken individually or viewed as a whole, the evidence presented did not reach the `compelling reason' standard set out in Gregg. [Citation omitted.]
....
"In the instant case, there was no evidence indicating K.R.'s contact with Forth affected her mental stability or veracity. There was no evidence of similar charges by K.R. against other men proven to be false. There was one instance of K.R.'s telling a falsehood. However, the falsehood did not involve the subject matter of this case. Based on the compelling reason standard Lavery had to meet, the trial court's denial of his motion cannot be said to be an abuse of discretion." Lavery, 19 Kan.App.2d at 676-77, 877 P.2d 443.
In the present case, the defense presented weaker evidence than the evidence presented in Gregg, Blackmore, or Lavery. M.V.'s testimony was consistent and showed no evidence of mental instability or a lack of veracity. There was only meager evidence of M.V.'s possible molestation by a distant family member. As the district court observed when making a ruling during the trial, children are most often "forced to go to bed" for reasons other than sex; often children are upset by such a directive, especially when it is given as a punishment. Further, the one instance where M.V. allegedly told a falsehood showed that she might have had some sexual knowledge, but that in itself is not a compelling reason for a psychological examination, especially since the context does not suggest she was fabricating an allegation against Berriozabal.
Considering the compelling circumstances standard which had to be met by Berriozabal, the district court's denial of Berriozabal's motion for a psychological examination of M.V. was not an abuse of discretion.

RAPE SHIELD
Along similar lines, Berriozabal next argues that the district court erred by excluding evidence under K.S.A. 21-3525(b), commonly known as the Kansas rape shield statute. Specifically, Berriozabal sought to introduce evidence that M.V. had previously been sexually abused by Eddie. Berriozabal argues that the evidence should have been permitted because the State opened the door by eliciting the trial testimony of the trauma nurse who testified that M.V. indicated she had had no sexual contact prior to Berriozabal. We reject this argument.

Standard of Review/Rape Shield Statute
The threshold question on the admissibility of all evidence is relevancy. See State v. Reid, 286 Kan. 494, 507-09, 186 P.3d 713 (2008). K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. Reid, 286 Kan. at 509, 186 P.3d 713.
Relevancy, in addition to being the focus of general considerations regarding the admission of evidence, is the key consideration when applying the rape shield statute, K.S.A. 21-3525(b), which prohibits the admission of evidence of a rape victim's previous sexual conduct with any person, including the defendant, unless the district court first determines the evidence to be relevant and otherwise admissible. In the past, this court has concluded that prior sexual conduct evidence may be material if it is relevant to issues such as the identity of the rapist, consent of the complaining witness, or whether the defendant actually had intercourse with the complaining witness. See, e.g., State v. Bressman, 236 Kan. 296, 300, 689 P.2d 901 (1984). The court has cautioned, however, that "the legislature sent a clear message to the courts that a rape victim's prior sexual activity is generally inadmissible since prior sexual activity, even with the accused, does not of itself imply consent to *366 the act complained of." State v. Stellwagen, 232 Kan. 744, 747, 659 P.2d 167 (1983).
The district court's determination of whether evidence of prior sexual conduct will be probative of a material issue will not be overturned on appeal if reasonable minds could disagree as to the court's decision. See State v. McMullen, 290 Kan. 1, 7, 221 P.3d 92 (2009); State v. Zuniga, 237 Kan. 788, Syl. ¶ 4, 703 P.2d 805 (1985).

Evidence in this Case
The evidence Berriozabal believes relevant under the rape shield statute involved a conversation M.V. allegedly had with A.U. about not being a virgin because of being raped by "an uncle" and another conversation M.V. allegedly had with Berriozabal about Eddie, who Berriozabal refers to as M.V.'s great uncle, forcing M.V. "to go to bed." Berriozabal argues the evidence of a prior sexual assault was relevant to provide an alternative source for the healed vaginal tear found by the sexual assault nurse during her physical examination of M.V. Because the evidence could provide an explanation for the healed vaginal tear, a material issue is involved.
The question remains whether the evidence was probative. The district court concluded, at two points in the proceeding, that the evidence was too vague and speculative to establish proof of a prior sexual assault. On the first occasion, following the pretrial arguments on the issue of M.V.'s prior sexual conduct, the district court denied Berriozabal's motion to admit such evidence, finding that the alleged incident between M.V. and Eddie was "if anything, a mere possibility but not in any way reflected in the record as a probability."
Then, Berriozabal again moved to admit the evidence following the testimony of the sexual assault nurse. Testifying for the prosecution, the nurse told the jury that during her examination of M.V. she asked M.V. if she had ever experienced any other sexual abuse. M.V. "denied that" and also denied being sexually active. The nurse further testified that she found an area on M.V.'s vagina that appeared to be a "healed transaction" or tear.
The testimony regarding M.V.'s denial of being sexually active was contrary to the proffered testimony of A.U. Consequently, the district court permitted only limited testimony relative to the argument between M.V. and A.U. However, the district court again denied the admission of evidence regarding the conversations about Eddie, stating:
"Unfortunately, none of the witnesses [at the pretrial hearings] seemed to know a[n] Eddie.... [M.V.] continued to testify and deny [at the pretrial hearings] that there was any activity other than the simple statement ... that she was forced to go to bed. The inference is to be drawn whether that was some type of sexual contact or whether there was just a disciplinary matter, she had to go to her room and to go bed...."

Analysis
Berriozabal offers no case law in support of his arguments that the "Eddie" evidence was admissible.
The State cites and distinguishes a case that has some factual similarities to this case. In State v. Bourassa, 28 Kan.App.2d 161, 15 P.3d 835 (1999), rev. denied 269 Kan. 934 (2000), the alleged rape and kidnapping victim had previously told police that her father had sexually assaulted her. The victim had been with her father on the morning of the alleged rape, and the defendant argued that the rape shield evidence was relevant to show that the victim's father could have committed the crimes. Bourassa, 28 Kan.App.2d at 168, 15 P.3d 835. The Court of Appeals agreed and reversed for further proceedings.
We agree with the State that the present case is distinguishable in that in this case there was a lack of proof of the victim's prior sexual molestation. As the district court found, although M.V. allegedly tearfully told Berriozabal that Eddie "forced her to go to bed," she mentioned no details to confirm that this was an experience involving sexual contact. At trial and at pretrial hearings, M.V. consistently denied the existence of this alleged sexual assault and denied knowing a person named Eddie. The other evidence *367 related to A.U.'s reporting that M.V. said she was raped by an uncle, but A.U. could not remember any further details and could not remember the uncle's name. M.V. denied making any such statement to A.U.
Given the nature of this evidence, reasonable people could agree with the district court that the scant evidence regarding Eddie was too vague, speculative, and uncorroborated to be probative. As such, we conclude the district court did not abuse its discretion.

CRUEL AND UNUSUAL PUNISHMENT
Next, Berriozabal argues that his two consecutive hard 25 life sentences constitute cruel and/or unusual punishment under § 9 of the Kansas Constitution Bill of Rights or the Eighth Amendment to the United States Constitution.
The life sentences imposed upon Berriozabal were statutorily mandated. Under K.S.A.2006 Supp. 21-4643, for certain enumerated offensesincluding the rape of a child under 14 years of age (K.S.A. 21-3502[a][2]) and the attempted rape of a child under 14 years of age (K.S.A. 21-3301 and K.S.A. 21-3502[a][2])committed on or after July 1, 2006, by a defendant who is 18 years of age or older, the legislature requires that the defendant "shall be sentenced to a term of imprisonment for life with a mandatory minimum term of imprisonment of not less than 25 years" unless, for first-time offenders, substantial and compelling reasons justify a departure. K.S.A.2006 Supp. 21-4643(a)(1), (d). Likewise, for offenses committed on or after July 1, 2006, a person convicted of a sexually violent crime and who is released from prison "shall be released to a mandatory period of postrelease supervision for the duration of the person's natural life." K.S.A.2006 Supp. 22-3717(d)(1)(G). Rape and attempted rape are statutorily defined as sexually violent crimes. K.S.A.2006 Supp. 22-3717(d)(2)(A), (K).
Unlike other defendants who have argued his or her life sentence is a cruel or unusual punishment, Berriozabal presented these constitutional arguments to the district court before sentencing. See, e.g., State v. Mondragon, 289 Kan. 1158, 1162-64, 220 P.3d 369 (2009); State v. Easterling, 289 Kan. 470, 485-86, 213 P.3d 418 (2009). The issue was first raised in Berriozabal's motion for a dispositional departure when he stated that a hard 25 life sentence would be "disproportionate and cruel and unusual under the state and federal constitutions." Then, during the sentencing hearing, defense counsel advanced arguments regarding Berriozabal's constitutional concerns.
The district court ultimately denied Berriozabal's motion for a dispositional departure but in doing so did not make specific findings regarding Berriozabal's cruel and unusual punishment arguments.
Berriozabal renewed his arguments on appeal, citing to the Eighth Amendment to the United States Constitution and to § 9 of the Kansas Constitution Bill of Rights. Following the submission of briefs, this court requested supplemental briefing on the question of whether the three-part test stated in State v. Freeman, 223 Kan. 362, Syl. ¶ 2, 574 P.2d 950 (1978), for determination of whether a sentence violated § 9 of the Kansas Constitution Bill of Rights should be modified in light of subsequent Eighth Amendment decisions of the United States Supreme Court, specifically, Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003); Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). This court sought the parties' input on this question that had been raised in another case being heard on the same docket, State v. Gomez, 290 Kan. 858, 235 P.3d 1203 (2010).
Approximately 2 weeks after oral arguments in this case, the United States Supreme Court issued another decision addressing the Eighth Amendment, Graham v. Florida, 560 U.S. ___, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Shortly thereafter, Berriozabal requested proceedings in this case be stayed, that he be allowed to file a supplemental brief raising an additional issue regarding his hard 25 life sentence for attempted rape, and that the case be remanded to *368 the district court. The motion did not mention Graham. We denied the motion to remand but stayed proceedings and allowed the additional briefing. Before the parties' supplemental briefs were filed, this court issued a decision in Gomez, addressing the arguments regarding the impact of the United States Supreme Court cases on the Freeman three-part test. Despite the additional briefing and the rapidly evolving case law on this issue, neither party in this case submitted a letter of additional authority under Supreme Court Rule 6.09 (2010 Kan. Ct. R. Annot. 48) addressing either Graham or Gomez or the application of those cases to the facts presented here.
Hence, there is nothing to add to the considerations discussed in Gomez. Consequently, we see no need to repeat our Gomez analysis here. In summary, regarding arguments made under § 9 of the Kansas Constitution Bill of Rights, we reiterated and confirmed the continued viability of the three-part test this court had established in Freeman. In Gomez, we stated:
"Under § 9 of the Kansas Constitution Bill of Rights, a punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity. A three-part test is utilized to administer this principle: (1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment; (2) a comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question, the challenged penalty is to that extent suspect; and (3) a comparison of the penalty with punishments in other jurisdictions for the same offense." State v. Gomez, 290 Kan. 858, Syl. ¶ 9, 235 P.3d 1203.
We also followed our prior case law in stating that this three-part test, which we have generally referred to as the Freeman factors, includes both legal and factual inquiries and no single factor controls the outcome. Consequently, the issue could not be determined for the first time on appeal because appellate courts do not make factual findings and instead review those made by a district court. Gomez, 290 Kan. at 867-68, 235 P.3d 1203.
This result in Gomez did not vary from the fairly long line of recent cases, some of which are cited above, in which we have determined a defendant failed to properly preserve a § 9 challenge by not raising the issue before the district court. In this case, however, Berriozabal raised the question in his motion and at his sentencing hearing. In this regard, his situation is more like that in State v. Seward, 289 Kan. 715, 217 P.3d 443 (2009).
In Seward, the defendant raised state and federal cruel and/or unusual punishment challenges during plea negotiations, in his motion for downward departure, and during his sentencing hearing. As in this case, the district court did not make findings regarding any of the Freeman factors. This court noted that appellate courts do not make factual findings but review those made by district courts. We noted, however, that there had been confusion in our case law regarding whether the burden of assuring that findings were adequate for appeal fell on a party or on the district court. After discussion, we concluded:
"Supreme Court Rule 165 (2008 Kan. Ct. R. Annot. 235) places the primary duty for arriving at adequate findings and conclusions on the district judge. A defendant who wishes to appeal on the basis of a constitutional challenge to a sentencing statute must, however, ensure that the findings and conclusions by the district judge are sufficient to support appellate argument by the filing of a motion invoking the judge's duty under Rule 165, if necessary." Seward, 289 Kan. 715, Syl. ¶ 3, 217 P.3d 443.
*369 Despite the fact the defendant in that case had not taken steps to assure adequate findings had been made, we remanded the case for further proceedings, but cautioned:
"We emphasize that we believe this case to be exceptional. In the future, a defendant who wishes to appeal on the basis of a constitutional challenge to a sentencing statute must ensure the findings and conclusions by the district judge are sufficient to support appellate argument, by filing of a motion invoking the judge's duty under Rule 165, if necessary." Seward, 289 Kan. at 721, 217 P.3d 443.
Seward was filed on October 2, 2009. The journal entry in this case was filed on April 7, 2008, before we had made it clear that a defendant would have the duty to ensure adequate findings of fact. Hence, when this journal entry was filed, Berriozabal's duty under Rule 165 was unclear. Furthermore, Berriozabal did as much to preserve his § 9 cruel or unusual punishment argument as had Seward. These circumstances lead us to conclude that Berriozabal is entitled to the same relief: remand for entry of sufficient factual findings and conclusions of law on the issue of whether a life sentence in this case violates § 9 of the Kansas Constitution Bill of Rights.
There remains the question of whether Berriozabal has preserved an issue under the Eighth Amendment to the United States Constitution and, if so, whether there is a legal basis for such a claim under the case law of the United States Supreme Court. We considered these same issues in Gomez. In doing so, we reached the following conclusions regarding the framework for an Eighth Amendment challenge after the Graham decision:
"An Eighth Amendment challenge to a term-of-years sentence as disproportionate and therefore cruel and unusual falls into one of two general classifications. The first classification involves challenges that argue the term of years is grossly disproportionate given all the circumstances in a particular case. The second classification comprises cases in which the court implements the proportionality standard by certain categorical restrictions."
"In conducting an Eighth Amendment analysis to determine whether a sentence for a term of years is grossly disproportionate for a particular [offender's] crime, a court must begin by comparing the gravity of the offense and the severity of the sentence. This analysis can consider a particular offender's mental state and motive in committing the crime, the actual harm caused to the victim or to society by the offender's conduct, any prior criminal history, and a particular offender's propensity for violence. In the rare case in which this threshold comparison leads to an inference of gross disproportionality, the court should then compare the [offender's] sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual."
"An Eighth Amendment challenge that the length of a term-of-years sentence is disproportionate given all the circumstances in a particular case is a case-specific challenge and is inherently factual. Because appellate courts do not make factual findings but review those made by district courts, such a challenge must be raised in the district court and a defendant must obtain the necessary findings of fact in the district court in order to preserve the issue for appellate review."
"In limited circumstances, a categorical analysis may apply to an Eighth Amendment cruel and unusual challenge. In considering a categorical challenge, a court first considers objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by controlling precedents and by the court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the court must determine in the exercise of its own independent judgment whether the punishment *370 in question violates the United States Constitution. The judicial exercise of independent judgment requires consideration of the culpability of the category of offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. In this inquiry the court also considers whether the challenged sentencing practice serves legitimate penological goals of retribution, deterrence, incapacitation, and rehabilitation." Gomez, 290 Kan. 858, Syl. ¶¶ 4-7, 235 P.3d 1203.
In Gomez, the defendant had not raised a possible Eighth Amendment challenge in the district court and on appeal had mentioned the Eighth Amendment only in passing. Hence, not only were there no factual findings, there was no way to determine whether the defendant was making a case-specific proportionality argument, a categorical argument, or both. Even though the impact of United States Supreme Court cases had been discussed in briefs before the court, it had only been done in the context of how those cases might impact an analysis under the Kansas Constitution. Noting this, we held:
"To preserve an issue for appellate review, a party must do more than incidentally raise the issue in an appellate brief. The party must present an argument and support that argument with pertinent authority or show why the argument is sound despite a lack of supporting authority or in the face of contrary authority. Otherwise, the argument will be deemed abandoned." Gomez, 290 Kan. 858, Syl. ¶ 8, 235 P.3d 1203.
In contrast to Gomez' situation, Berriozabal's motion for sentencing departure included a reference to the federal constitution, although the Eighth Amendment was not specifically mentioned. His brief on appeal cited the Eighth Amendment and federal cases. Then, albeit at this court's request, he discussed the specifics of an Eighth Amendment analysis. Hence, Berriozabal has preserved and pursued an Eighth Amendment issue.
Nevertheless, because Berriozabal has not filed a letter of supplemental authority, we are left to guess about the specifics of how he would frame his arguments under the analysis of Graham and Gomez. Further, like a Freeman analysis, a federal case-specific proportionality analysis requires factual findings. Consequently, we conclude that Berriozabal's Eighth Amendment challenge should also be remanded to the district court.
On remand, Berriozabal should be required to articulate the specific grounds for his Eighth Amendment challengeclarifying whether he brings a case-specific proportionality challenge, a categorical challenge, or both. Based on those arguments, the district court should make adequate findings of fact and conclusions of law regarding whatever challenge Berriozabal chooses to pursue under either the Eighth Amendment to the United States Constitution or § 9 of the Kansas Constitution Bill of Rights, or both.

ATTEMPTED RAPE SENTENCE
As previously noted, following oral argument in this case, Berriozabal requested permission to file a supplemental brief regarding his hard 25 life sentence for attempted rape, contending for the first time that this court's recent decision in State v. Horn, 288 Kan. 690, 206 P.3d 526 (2009), requires the imposition of a nondrug severity level 1 felony sentence for that conviction.
Arguing that the present situation is similar to those situations involving the identical offense sentencing doctrine as established in State v. McAdam, 277 Kan. 136, 142-45, 83 P.3d 161 (2004), Berriozabal urged us to permit him to raise the current sentencing issue on direct appeal in order to (1) successfully alter a sentence which, because it is authorized by Jessica's Law, is technically not "illegal" and thus could not be later challenged and (2) avoid ineffective assistance of appellate counsel. See Laymon v. State, 280 Kan. 430, 438, 444, 122 P.3d 326 (2005) (invocation of McAdam, providing defendant could only be sentenced to lesser penalty when defendant is convicted under statutes containing identical elements but providing different penalties, will be unsuccessful if no direct appeal was taken and the invocation occurs for the first time on a collateral attack of *371 sentence; appellate counsel's failure to pursue McAdam line of argument was ineffective assistance of counsel); State v. McCoin, 278 Kan. 465, 467-68, 101 P.3d 1204 (2004) (no jurisdiction over untimely motion for arrest of judgment based on McAdam; sentence in violation of McAdam not "illegal," thus not a candidate for modification under K.S.A. 22-3504); State v. Barnes, 278 Kan. 121, 123-24, 92 P.3d 578 (2004) (sentence imposed contrary to the holding in McAdam is not "illegal"). We concluded these points had merit and allowed Berriozabal to file the supplemental brief.
In the supplemental brief, Berriozabal argued our decision in Horn mandated vacating his sentence for attempted rape. The State agreed. In Horn, the defendant was convicted of attempted aggravated sodomy. This court held the defendant was required to be given a Kansas Sentencing Guidelines Act sentence for a nondrug severity level 1 felony, as provided in K.S.A. 21-3301(c) ("An attempt to commit an off-grid felony shall be ranked at nondrug severity level 1."), rather than a mandatory minimum prison term of 25 years under Jessica's Law, K.S.A. 21-4643(a)(1)(G) (hard 25 life imprisonment also applies to "an attempt" of enumerated sexually violent crimes, including aggravated sodomy). Horn established that where the legislature permits the existence of conflicting statutory provisions prescribing different sentences to be imposed for a single criminal offense, the rule of lenity requires that any reasonable doubt as to which sentence applies must be resolved in favor of the offender. Because, by their terms, both statutes were equally applicable to Horn's attempted aggravated sodomy conviction, the rule of lenity required the application of the statute defining attempt. Horn, 288 Kan. at 693-94, 206 P.3d 526.
Likewise, the attempted rape offense in Berriozabal's case is defined by the attempt sentencing statute, K.S.A. 21-3301(c), which ranks the offense as a nondrug severity level 1 felony. Under Horn, although Jessica's Law imposes a mandatory minimum prison term of 25 years to "an attempt" to commit rape, the rule of lenity requires the application of the statute defining sentences for an attempt to commit an off-grid crime. Thus, Berriozabal is entitled to receive a nondrug severity level 1 felony sentence for attempted rape.
Affirmed in part, sentences vacated in part, and remanded for resentencing.
DAVIS, C.J., not participating.
THOMAS E. MALONE, J., assigned.[1]
NOTES
[1] REPORTER'S NOTE: Judge Malone, of the Kansas Court of Appeals, was appointed to hear case No. 100,291 vice Chief Justice Davis pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c).