(273 P.3d 813)
No. 106,325

In the Matter of the Adoption of C.A.T., B.T.M., and E.A.K.M., Minor Children.

258

Opinion filed March 30, 2012.

*Elaine M. Esparza*, of Harper, for appellant father.

*Kerwin L. Spencer*, of Wellington, for appellee adoptive stepfather.

Before GREEN, P.J., ARNOLD-BURGER and BRUNS, JJ.

BRUNS, J.: M.S., who is married to A.S., filed a petition to adopt her children, C.A.T., B.T.M., and E.A.K.M. The adoption of C.A.T., who has a different father than his siblings, was not challenged at the district court level and is not at issue in this case. But J.R, the natural father of B.T.M. and E.A.K.M., asserted his parental rights and refused to consent to their adoption. After holding an evidentiary hearing, the district court terminated J.R.'s parental rights under K.S.A. 2010 Supp. 59-2136(h)(1)(F)—which permits termination of a father's parental rights if a child is conceived as a result of rape—and granted the adoption. Under the unique circumstances presented, we find that K.S.A. 2010 Supp. 59-2136(h)(1)(F) is applicable in this case. Furthermore, because there is substantial evidence in the record to establish that B.T.M. was conceived as a result of rape and because there is substantial evidence in the record that J.R. failed to perform his parental duties as to E.A.K.M. for 2 consecutive years prior to the filing of the

petition for adoption under K.S.A. 2010 Supp. 59-2136(h)(1)(G), we affirm the decision of the district court.

## FACTS

Although it is undisputed that A.S. gave birth to B.T.M on August 30, 2002, and that J.R. is the child's natural father, the events that occurred on the night of B.T.M.'s conception are disputed. A.L. testified at the hearing held by the district court in this case that she, J.R., and A.S went to a New Year's Eve party on December 31, 2001. According to A.L., the group headed to a friend's house for breakfast after the party, where J.R. raped A.S.

A.L. testified that A.S. was "pretty out of it" from drinking too much. When A.S. started to dry heave, A.L. helped her to the bathroom. J.R. came in to help, and A.L. left the bathroom for a moment to get a rag. When A.L. returned to the bathroom, she found that the door had been locked from the inside.

A.L. testified that she banged on the bathroom door, but J.R. refused to let her in. Through the bathroom door, A.L. heard A.S. saying "no, no, no" and "stop." About an hour later, J.R. and A.S. came out of the bathroom. Evidently, J.R. was asked to leave the house. After protesting, he left the residence and sat in A.S.'s car to wait for her. After A.S. had sobered up, she left with J.R.

A.S. testified that she never had sex with J.R. prior to that night. Although she did not remember exactly what happened on the evening of B.T.M.'s conception, A.S. recalled that everyone at the house was mad at J.R. and that she had wanted to kill him. A few days later, A.L. told A.S. what she had heard through the bathroom door. But when A.S. confronted J.R., he denied that he had forced himself on her.

Subsequently, A.S. discovered she was pregnant. For a short period of time during the pregnancy, A.S. and J.R. lived together. By the time B.T.M. was born, however, J.R. had moved out. According to A.S., she did not initially tell J.R. about the birth because she was not sure if he was B.T.M's father.

A few months later, Kansas Social and Rehabilitation Services (SRS) instituted a paternity action against J.R., and DNA testing was ordered by the district court. The results of the DNA test

conclusively showed that J.R. was B.T.M.'s father. Thereafter, J.R. began receiving court-ordered parenting time with B.T.M.

A.S.'s current husband testified that he later confronted J.R. and that J.R. admitted to raping A.S. in the bathroom on the night of B.T.M.'s conception. J.R., however, denied making such an admission. In fact, J.R. testified to a quite different version of the events that led to B.T.M.'s conception.

According to J.R., he and A.S. had consensual sex in a shower at A.L.'s house. After A.S. learned that she was pregnant, she and J.R. decided to live together because they thought she was carrying his child. After finding out that A.S. had been involved with another man, J.R. began to doubt the child's paternity and he moved out. J.R. claims he did not know he was the father of B.T.M. until November 2002, about 3 months after the child was born.

E.A.K.M. was born on August 8, 2004. According to A.S., E.A.K.M. was also conceived as a result of rape. A.S. testified that on the night of E.A.K.M.'s conception, she brought B.T.M. with her to a card party held at the house of J.R.'s stepmother. Evidently, A.S. was asked to stay the night so that J.R. could spend more time with B.T.M.

Once again, A.S. was "out of it" from drinking too much liquor. Although she did not remember doing so, A.S. eventually went to bed in J.R.'s sister's bedroom. A.S. testified she recalls waking up and being confused because J.R.'s sister was not with her in the bedroom and her pants were on the floor. When she went to the bathroom, she "just felt something" but did not realize that she had been raped.

When A.S. later found out that she was pregnant, she initially thought the father was another man she had been dating. But when her doctor told A.S. the conception date, she realized that J.R. had raped her again. Subsequently, DNA testing confirmed that J.R. was also the father of E.A.K.M.

On the other hand, J.R. testified that he and A.S. got back together after B.T.M. was born to try to work things out for their son. During this period, J.R. was living at his stepmother's house and A.S. would bring B.T.M. for visits. According to J.R., he, A.S., and B.T.M. slept in his sister's bedroom on several occasions. And

J.R. claims that on one of these nights, E.A.K.M. was conceived as a result of consensual sex.

On January 3, 2006, A.S. married M.S. More than 5 years later, on March 17, 2011, M.S. filed a petition to adopt C.A.T., B.T.M., and E.A.K.M. In response, J.R. asserted his parental rights and withheld his consent to the adoption. At the hearing held by the district court in this case, M.S. conceded that J.R. had made substantial child support payments on behalf of B.T.M. But the only child support payment made by J.R. on behalf of E.A.K.M. was $126 withheld from an income tax refund.

J.R. acknowledged that he had not seen E.A.K.M. since February 2007 and had not seen B.T.M. since August 2007. But he claimed to have called A.S.'s grandmother on numerous occasions in an attempt to see his children. According to J.R., he ultimately stopped calling because his requests were ignored and because he believed A.S.'s family would "try to get [him] for harassment." J.R. also testified that he had contacted an attorney to assist him in obtaining parenting time, but he could not remember the attorney's name.

In a journal entry entered on June 7, 2011, the district court terminated J.R.'s parental rights and granted M.S.'s petition for adoption of B.T.M. and E.A.K.M. Specifically, the district court found by clear and convincing evidence that J.R.'s consent to the adoption was not required under K.S.A. 2010 Supp. 59-2136(h)(1)(F) because B.T.M. and E.A.K.M. were conceived as a result of rape. Additionally as to E.A.K.M., the district court concluded that J.R. had failed to assume the duties of a parent because he made only one incidental child support payment on E.A.K.M.'s behalf and had no contact with her since February 2007.

## ANALYSIS

On appeal, J.R. raises three issues: (1) whether it was proper for the district court to apply K.S.A. 2010 Supp. 59-2136(h)(1) in this case; (2) whether there was sufficient evidence presented at the final hearing to support the district court's decision; and (3) whether the district court's decision was in the best interests of the children.

*Application of K.S.A. 2010 Supp. 59-2136(h)(1)(F)*

J.R. contends that the district court erred when it applied K.S.A. 2010 Supp. 59-2136(h)(1)(F) in this case rather than K.S.A. 2010 Supp. 59-2136(d) to terminate his parental rights without his consent. In response, M.S. contends that K.S.A. 2010 Supp. 59-2136(d) does not apply to this case because J.R. was presumed to be the father of B.T.M. and E.A.K.M. under K.S.A. 38-1114(a)(5). Based on the plain and unambiguous language of K.S.A. 2010 Supp. 59-2136(d), we agree with M.S.

We recognize that the Kansas Supreme Court recently found as follows in the case of *In re Adoption of J.M.D.*, 293 Kan. 153, 162, 260 P.3d 1196 (2011):

"The clearly stated intent of [K.S.A. Supp. 2010 Supp. 59-2136(d)] was to treat the parental rights termination of natural or presumed fathers differently in stepparent adoptions than in other types of adoptions. That stated intent contradicts an implication that the legislature intended to incorporate the parental termination provisions of subsection (h) into the stepparent adoption provisions of subsection (d)."

As our Supreme Court's decision in *J.M.D.* clearly concludes, the legislature did not intend to graft the provisions of K.S.A. 2010 Supp. 59-2136(h) onto K.S.A. 2010 Supp. 59-2136(d). As such, if K.S.A. 2010 Supp. 59-2136(d) were applicable to the present case, it would be inappropriate to look to the provisions of K.S.A. 2010 Supp. 59-2136(h). But *J.M.D.* did not address the specific issue presented in this case. See *Riggs v. Snell*, 186 Kan. 725, 727, 352 P.2d 1056 (1960)("[A] decision of this or any other court is authority only for the exact question presented for judicial determination.").

In *J.M.D.*, the father was presumed under K.S.A. 38-1114(a)(1)—which establishes a presumption when a child is born during a marriage or within 300 days after the marriage is terminated—a presumption clearly covered by K.S.A. 2010 Supp. 59-2136(d). See 293 Kan. at 159, 162. In the present case, however, J.R. was presumed to be the father of B.T.M. and E.A.K.M. under K.S.A. 38-1114(a)(5)—which establishes a presumption of paternity based on genetic testing—a presumption that is not covered by K.S.A. 2010 Supp. 59-2136(d) or addressed in *J.M.D.*

K.S.A. 2010 Supp. 59-2136(d) states, in relevant part:

"(d) In a stepparent adoption, if a mother consents to the adoption of a child *who has a presumed father under subsection (a)(1), (2) or (3) of K.S.A. 38-1114* and amendments thereto, or who has a father as to whom the child is a legitimate child under prior law of this state or under the law of another jurisdiction, the consent of such father must be given to the adoption unless such father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption or is incapable of giving such consent." (Emphasis added.)

The goal of statutory interpretation is to ascertain the intent of the legislature. See *In re Adoption of S.J.R.*, 37 Kan. App. 2d 28, 33, 149 P.3d 12 (2006). Words must be given their plain meaning, and language found in the statute cannot be excluded. 37 Kan. App. 2d at 33. Moreover, the legislature's express inclusion of one thing generally means it intended to exclude others. See *Degollado v. Gallegos*, 260 Kan. 169, 172, 917 P.2d 823 (1996). Accordingly, the statutory language, "who has a presumed father under subsection (a)(1), (2) or (3) of K.S.A. 38-1114," cannot be ignored.

The legislature expressly included paternity presumptions (1), (2), and (3) of K.S.A. 38-1114(a) in K.S.A. 2010 Supp. 59-2136(d). As such, we must conclude that the legislature intended to exclude paternity presumptions (4), (5), and (6) of K.S.A. 38-1114(a) from K.S.A. 2010 Supp. 59-2136(d). Thus, based on the plain and unambiguous language of the statute, we conclude that K.S.A. 2010 Supp. 2010 Supp. 59-2136(d) is not applicable to J.R.'s situation.

It is important to note that each of the presumptions of paternity addressed in K.S.A. 2010 Supp. 59-2136(d) involve situations where the natural mother and father of a child were married or had attempted to be married. Conversely, the presumptions of paternity found in K.S.A. 38-1114(a)(4), (5), and (6) have nothing to do with marriage. Although it is not necessary to look to the legislative history of K.S.A. 2010 Supp. 59-2136(d) because legislative intent can be determined from the plain and unambiguous statutory language, we note that the legislative history confirms that the legislature intended that the statute be applicable to stepparent adoptions involving only certain types of natural fathers.

Specifically, the Advisory Committee's comments that accompanied the enactment of K.S.A. 59-2136(d) stated:

" 'Subsection (d) limits the grounds for termination of *certain natural fathers'* parental rights in connection with stepparent adoptions. Generally, *if the child was the product of a marriage or attempted marriage,* the consent of the father must be obtained unless there was a failure to assume parental duties for two years.' " (Emphasis added.) *J.M.D.,* 293 Kan. at 162 (quoting Minutes of the House Judiciary Committee, March 28, 1990, Attachment 3).

Hence, it is apparent that the legislature only had "certain natural fathers" in mind—those presumed under K.S.A. 38-1114(a)(1), (2), and (3)—when it enacted K.S.A. 59-2136(d). Had the legislature intended for K.S.A. 2010 Supp. 59-2136(d) to govern all stepparent adoptions, it would not have needed to specify the three presumptions set forth in the statute. Thus, we find that the legislative history of K.S.A. 2010 Supp. 59-2136(d) verifies the legislative intent gleaned from the plain and unambiguous language used in the statute.

To support his argument that subsection (d) applies to stepparent adoptions even where paternity is presumed under K.S.A. 38-1114(a)(5), J.R. cites a case where this court applied subsection (d) to a stepparent adoption in which the natural father had been presumed through genetic testing under K.S.A. 38-1114(a)(5) and had never been married to the mother or attempted to marry the mother. See *In re Adoption of G.L.V.,* 38 Kan. App. 2d 144, 145, 163 P.3d 334 (2007), *aff'd* 286 Kan. 1034, 190 P.3d 245 (2008). As M.S. notes in his brief, the issue presented here—whether K.S.A. 2010 Supp. 59-2136(h) is applicable to a stepparent adoption not covered by K.S.A. 2010 Supp. 59-2136(d)—was not addressed in *G.L.V.* Rather, the issue in *G.L.V.* was whether the best interests of the child could override the need to obtain the father's consent. See 38 Kan. App. 2d at 146-47.

Furthermore, we note that statutes should not be interpreted to produce absurd or unreasonable results. See *Pruter v. Larned State Hospital,* 271 Kan. 865, 874, 26 P.3d 666 (2001). Under J.R.'s interpretation of K.S.A. 2010 Supp. 59-2136(d) and (h), a rapist's consent to adoption would be required if a stepparent petitioned for adoption of a child conceived as a result of rape, but a rapist's

consent would not be required if someone other than a stepparent petitioned to adopt the same child. We do not believe that the legislature intended such an absurd result.

In summary, we conclude that in stepparent adoptions where K.S.A. 2010 Supp. 59-2136(d) is applicable, the provisions of K.S.A. 2010 Supp. 59-2136(h) are not applicable. See *J.M.D.*, 293 Kan. at 154, 159; *S.J.R.*, 37 Kan. App. 2d at 29, 34-35. But in stepparent adoption cases—such as the present case—where K.S.A. 2010 Supp. 59-2136(d) is not applicable, the provisions of K.S.A. 2010 Supp. 59-2136(h) must be applied. Here, because J.R. was a presumed father under K.S.A. 38-1114(a)(5), K.S.A. 2010 Supp. 59-2136(d) did not apply, and the district court did not err in turning to the provisions of K.S.A. 2010 Supp. 59-2136(h)(1)(F) in this case.

*Clear and Convincing Evidence of Rape*

We "review the facts of the case in the light most favorable to the prevailing party below to ascertain whether the trial court's decision is properly supported by substantial competent evidence." *J.M.D.*, 293 Kan. at 171. "Substantial competent evidence possesses both relevance and substance and provides a substantial basis of fact from which the issues can be reasonably determined." *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709, 216 P.3d 170 (2009). Because we have found that the district court correctly proceeded under K.S.A. 2010 Supp. 59-2136(h), the evidence supporting its decision must also be clear and convincing—highly probable—when viewed in a light most favorable to the prevailing party. See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008) ("[T]he appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact.").

Under K.S.A. 2010 Supp. 59-2136(h)(1)(F), the consent of a natural father to an adoption is not required if it is found by clear and convincing evidence that the child was conceived as a result of rape. Here, the district court heard testimony from several witnesses regarding the circumstances surrounding the conceptions of B.T.M. and E.A.K.M. Ultimately, the district court found the

testimony of A.S., M.S. and A.L. to be more credible than that of J.R., and we cannot replace our judgment for that of the district court regarding questions of fact.

Rape under K.S.A. 2010 Supp. 59-2136(h)(1)(F) refers to conduct that would be criminal under K.S.A. 2010 Supp. 21-3502. See *In re Adoption of S.A.M.*, 36 Kan. App. 2d 894, 897, 147 P.3d 158 (2006). Rape is "sexual intercourse with a person who does not consent to the sexual intercourse . . . when the victim is overcome by force or fear . . . or when the victim is incapable of giving consent because of the effect of any alcoholic liquor . . . , which condition was known by the offender or reasonably apparent to the offender." K.S.A. 2010 Supp. 21-3502(a)(1)(A), (C). But unlike a criminal case where rape must be proven beyond a reasonable doubt, rape need only be proven by clear and convincing evidence under K.S.A. 2010 Supp. 59-2136(h)(1)(F). See *S.A.M.*, 36 Kan. App. 2d at 899.

Here, A.L. testified that on the night of B.T.M.'s conception, she heard A.S. telling J.R. "no, no, no" and "stop" from behind the locked bathroom door. This evidence supports a finding that A.S. did not consent to having sex with J.R. There is also evidence in the record that A.S. was under the influence of alcohol at the time of the sexual encounter that resulted in B.T.M.'s conception and that A.S. was therefore incapable of giving her consent. In fact, A.S. testified that it was not until a paternity test conclusively established that J.R. was the father of B.T.M. that she realized that she had been raped. Furthermore, M.S. testified that J.R. later admitted to him that he had raped A.S. in the bathroom. This testimony alone, if believed, is clear and convincing evidence that B.T.M. was conceived as the result of rape. Thus, we find substantial evidence in the record upon which a rational factfinder could find it highly probable that B.T.M.'s conception was the result of rape, and we will not replace our judgment for that of the district judge who actually heard the evidence presented by the parties.

As to E.A.K.M., we need not decide whether she was conceived as a result of rape. Rather, as discussed in the following section, we find that there is sufficient evidence in the record to establish by clear and convincing evidence that J.R. failed to assume the

duties of a parent as to E.A.K.M. For that reason, J.R.'s consent to the adoption of E.A.K.M. was not required.

*Failure to Assume the Duties of Parent as to E.A.K.M.*

Even if the evidence that E.A.K.M. was conceived as a result of rape is considered not to be clear and convincing, the district court appropriately found that J.R. had failed to assume the duties of a parent as to this child. Under K.S.A. 2010 Supp. 59-2136(h)(1)(G), consent is not necessary if it is found, by clear and convincing evidence, the father had failed or refused to assume the duties of a parent for the previous 2 years. The district judge concluded that as to E.A.K.M., J.R. had "failed or refused to assume the duties of a parent for more than two consecutive years next preceding the filing of the petition." This finding is sufficient to terminate J.R.'s rights to E.A.K.M. without his consent under K.S.A. 2010 Supp. 59-2136(d) or (h)(1)(G). But under subsection (h)(1)(G), this finding must have been highly probable to a rational factfinder.

In determining whether a father has failed or refused to assume the duties of a parent, a rebuttable presumption arises when the father has failed to provide a substantial portion of the child support as required by judicial decree. K.S.A. 2010 Supp. 59-2136(d), (h)(1)(G), and (h)(3). As of April 28, 2008, J.R. was $3,796 behind in payments to E.A.K.M. He was ordered to pay $115 a month since then, and he had only made one payment of $126 that came from an income tax withholding. The lack of payment triggered the presumption, and the court considered the single, involuntary payment as incidental. The court decided, within its discretion, to disregard this incidental payment. K.S.A. 2010 Supp. 59-2136(h)(2)(B). J.R. provided nothing else relevant to rebut the presumption. Because no evidence rebutted the presumption, the judge's finding that J.R. had failed or refused to assume the duties of a parent as to E.A.K.M. was highly probable. Thus, the district court did not commit error.

J.R. argues, for the first time on appeal, that the payments made to B.T.M. should be considered payments to the family—including E.A.K.M.—and thus the presumption was not triggered. But issues not raised below cannot be raised on appeal, and the failure to

support an argument with authority is no different than failing to brief an issue. See *State v. Berriozabal*, 291 Kan. 568, 594, 243 P.3d 352 (2010); *In re Care & Treatment of Miller*, 289 Kan. 218, 224-25, 210 P.3d 625 (2009). Even if J.R. had asserted this argument before the district court, however, we do not find it to be persuasive or supported by the evidence presented at the adoption hearing.

J.R. cites to *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d 664, 667, 29 P.3d 466 (2001), *aff'd* 273 Kan. 71, 41 P.3d 287 (2000), which held that in order to avoid triggering the presumption a father is not required to pay the full amount of support. But *Baby Girl S.* did not address the issue of whether support payments to one child should be considered support payments to the family as a whole. And we can find no authority to support J.R.'s argument.

Nevertheless, a review of the record reveals that J.R. made only one child support payment on behalf of E.A.K.M. in the amount of $126. And an order on April 28, 2008, found J.R. had a child support arrearage of $3,796 as to E.A.K.M. Further, as of February 10, 2011, J.R. had a child support arrearage of $9,051.12 as to B.T.M. Hence, J.R.'s total child support arrearage for the two children was at least $12,847.12. Thus, even if the amount of child support paid for both children is considered together, J.R.'s support of E.A.K.M. was still woefully inadequate.

*Best Interests of the Children*

Under K.S.A. 2010 Supp. 59-2136(h)(2)(A), the district court can consider the best interests of the child as a factor in determining whether to terminate parental rights. Viewing the evidence in the record in the light most favorable to M.S. as the prevailing party, we find that a reasonable factfinder could conclude that it was highly probable that the termination of J.R.'s parental rights and the adoption were in the best interests of both B.T.M. and E.A.K.M. Thus, we conclude that the district court did not commit error.

The district court found that the adoption was in the best interests of both children because M.S. had stable employment, had a good relationship with the children for several years, and that J.R.

had not been fulfilling the duties of a parent. Moreover, the district court considered evidence that J.R. had not protected B.T.M. from cigarette smoke, had raped his mother during a parenting time visit, and had failed to contact either child for approximately 3 years. We find each of these findings to be supported by substantial evidence in the record.

Affirmed.

\* \* \*

GREEN, J.: I dissent from that part of the majority opinion which holds that the parental rights of J.R., the natural father of B.T.M., should be terminated under K.S.A. 2010 Supp. 59-2136(h)(1)(F). This statute allows the termination of a father's parental rights if a child is conceived because of rape.

When a trial court terminates a person's parental rights based on factual findings made under K.S.A. 2010 Supp. 59-2136(h)(1), those factual findings will be reviewed on appeal to determine if, after reviewing all the evidence in the light most favorable to the prevailing party, the findings were highly probable, that is, supported by clear and convincing evidence, that the parent's rights should be terminated. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008).

## Conception of B.T.M.

In the trial court's memorandum of decision on the conception of B.T.M., it held that A.S. "did not consent to the [sexual] intercourse [with J.R.] and was overcome by force or fear contrary to K.S.A. 21-3502." So, the trial court concluded as a matter of law that J.R. raped A.S. and that J.R.'s consent was not needed for the adoption of B.T.M. Because issues of law are based on issues of fact, issues of law can only be settled by a testing of such facts.

## A.S.'s testimony

A.S. testified that she did not remember the facts about the force or fear used by J.R. in committing the alleged rape. Moreover, A.S. testified that she never reported the alleged rape incident to the police. Since A.S. has no memory about the details of the alleged

rape, one cannot infer from A.S.'s lack of memory that it was highly probable that J.R. raped A.S.

*A.L.'s testimony*

A.L., A.S.'s friend, testified that she heard A.S. saying "no, no, no," and "stop." A.L. acknowledged that she did not see what happened inside the bathroom between A.S. and J.R. She also testified that she banged on the bathroom door and asked J.R. to open the bathroom door. A.L. further testified that when J.R. did not open the door, she walked to another room in the house and waited for A.S. and J.R. to come out of the bathroom. A.L. testified that A.S. and J.R. were in the bathroom for approximately 1 hour. A.L. further testified that when J.R. and A.S. came out of the bathroom, she, along with one of her friends, told J.R. that he needed to leave. J.R. left the house and sat in A.S.'s car. A.L. testified that A.S. later walked to her car and that she and J.R. left in her car together.

From the record, it is readily apparent that A.L. and A.S. were good friends. A.L. testified that she had known A.S. all her life and that A.L.'s mother had been A.S.'s babysitter. Yet, when J.R. was allegedly raping A.S., for almost an hour, A.L. and her two friends, who were also in the house, did nothing to help A.S. Indeed, A.L. testified that she did not call the police during or after the alleged rape. While J.R. sat alone in A.S.'s car, it would have been the perfect time for A.S. or A.L. to call the police and report the alleged rape.

It is essential to the credibility of a witness' testimony that he or she had an opportunity to acquire the knowledge he or she claims to possess. A witness may have been at the place where the event occurred, and yet the witness may not have been in a situation to accurately observe the event. That situation exists in this case. For example, A.L. testified that she did not observe the alleged rape. She only heard A.S. say "no, no, no," and "stop." It is well known that witnesses not only have misunderstood what they have heard, but also they may have erred in repeating it.

*M.S.'s testimony*

M.S., A.S.'s husband, testified that J.R. admitted to him that he had raped A.S. in the bathroom. Nevertheless, M.S. was directly involved in the adoption proceeding. Moreover, M.S. had a stake in the outcome of the adoption action. So, M.S. was an interested witness. Generally, the testimony of a disinterested witness, all things being equal, is preferred to that of an interested witness.

In addition, the interest of a witness supplies the foundation for an argument, and often a persuasive one, against the value of an interested witness' testimony. For example, while testifying, M.S. showed that he was not an objective witness when he failed to properly respond to a direct examination question put to him and blurted out that J.R. was a liar:

"Q. Okay. And did he [J.R.] also admit to you that people were pounding on the door trying to get in?

"A. Yes. But he—he—he lied when he said he ha[d] excuse; that she asked him to have sex with [her]. And that was not true. She was completely out."

How would M.S. know that A.S. was unconscious when he was not a witness to this alleged event? Thus, he would have had to learn about this alleged fact (that A.S. was unconscious) from someone else. Moreover, based on his testimony, M.S. considered this alleged fact to be true. As an interested witness, M.S.'s testimony clearly showed a bias toward the success of the adoption proceeding.

The majority explains that it was natural for A.S. to forget or not remember the facts of the alleged rape because she was highly inebriated from drinking alcohol. Yet, the trial court specifically held in its memorandum decision that A.S. "did not consent to the [sexual] intercourse [with J.R.] and was overcome by force or fear contrary to K.S.A. 21-3502." Indeed, the trial court's memorandum decision lacks any specific holding about A.S. being incapable of giving consent because of her consumption of alcohol.

Normally, a litigant must object to inadequate findings of fact and conclusions of law at the trial court level in order to preserve the issue for appeal. See *Gilkey v. State*, 31 Kan. App. 2d 77, 77-78, 60 P.3d 351, *rev. denied* 275 Kan. 963 (2003). Yet, one of J.R.'s

principal arguments on appeal relates to whether sufficient evidence existed for the trial court to conclude that his parental rights should be terminated under K.S.A. 2010 Supp. 59-2136(h)(1)(F). When a trial court has made findings under K.S.A. 2010 Supp. 60-252, it is unnecessary for a party to object to such findings to question the sufficiency of the evidence on appeal. Under K.S.A. 2010 Supp. 60-252(a)(4), it states as follows:

"A party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them or moved for judgment on partial findings."

Thus, the trial court's admitted findings, even in the absence of an objection to the trial court's findings, may be considered.

As stated earlier, the trial court failed to find in its memorandum decision that A.S. was under the influence of alcohol when the sexual intercourse that resulted in B.T.M.'s conception occurred. Moreover, the trial court made no written finding that A.S. had been incapable of giving consent to the sexual intercourse with J.R. that resulted in B.T.M.'s conceptions because of her consumption of alcohol. Thus, the trial court failed to make a finding concerning this alternative way of committing rape.

The majority also points out that the trial court determined that the testimony of A.S., M.S., and A.L. to be more credible than the testimony of J.R. Even so, it would be a logical non sequitur to conclude that because A.S. and her witnesses were more credible than J.R. that therefore A.S. was raped by J.R. But this is exactly what the trial court did. In concluding that it was highly probable that J.R. raped A.S. because her testimony was persuasive and credible, the trial judge stated:

"With regard to the conception of both children, I found the testimony of the natural mother to be persuasive and credible. And also the testimony of the very first witness corroborates that what I deemed to be a credible testimony from her. [A.L.] So I think that—so their version of the—the conception is that they were rape, I found that that evidence was clear and convincing."

Yet, given the earlier described established facts, one could not infer that it was highly probable that A.S. was raped based on the trial court's holding (that A.S. did not consent to have sexual in-

tercourse with J.R. and that she was overcome by force and fear). The key to a logical inference is the reasonable probability that the conclusion flows from the evidentiary data. Although a factfinder is entitled to draw reasonable inferences from circumstantial evidence, reasonable inferences themselves must be more than speculation and conjecture. See *State v. Burton*, 235 Kan. 472, Syl. ¶ 3, 681 P.2d 646 (1984) (stating that "[p]resumptions and inferences may be drawn only from facts established and presumption may not rest upon presumption or inference on inference"). The *Burton* court further stated that "[w]hat is meant by this rule is that an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility." 235 Kan. at 477.

Moreover, inferences cannot be drawn from facts and conditions merely imagined or assumed. *State v. Williams*, 229 Kan. 290, 299-300, 623 P.2d 1334, *reh. denied* 229 Kan. 646, 650, 630 P.2d 694 (1981). Here, the trial court and the majority assumed that A.S. was raped because the testimony of A.S., M.S., and A.L. was more credible than the testimony of J.R. As stated earlier, the fact that A.S.'s evidence was more credible than J.R.'s evidence does not mean that the alleged rape of A.S. was highly probable based on the established facts.

For example, some of the evidence which weakens the probative value of A.S.'s alleged rape evidence is as follows: (1) A.S. had no memory about the details of either of the alleged rapes which resulted in the conceptions of B.T.M. and E.A.K.M. Yet, A.S. could specifically remember that she did not consent to sexual intercourse with J.R. on either occasion when the two children were conceived. Moreover, A.S. could remember the details of what she was doing and where she was when B.T.M. and E.A.K.M. were conceived, and yet she contends that she cannot remember other things directly connected with the conception of these children; (2) A.S. failed to report either of the alleged rapes to the police; (3) A.S. and J.R. left together in A.S.'s car after the alleged rape which resulted in the conception of B.T.M.; (4) Although A.L. testified that she believed that J.R. had raped her best friend, A.L. allowed A.S. to leave with J.R. without ever calling the police or

reporting the alleged rape incident to the police. Moreover, A.L. was not in a situation to accurately observe the alleged rape which resulted in the conception of B.T.M.; and (5) M.S.'s testimony was not objective and was clearly slanted in support of the adoption of B.T.M. and E.A.K.M.

The testimony of the above-described witnesses weakened the positive evidence of the alleged rapes. Yet, there is no discussion in the record by the trial court showing that it weighed this evidence against the positive evidence of the alleged rapes. If the trial court had done this weighing of the evidence, it would have seen that the positive evidence in support of the alleged rapes had been completely neutralized by the above described evidence. Thus, the established facts would have raised only a mere possibility that A.S. had been raped in the way the trial court had held.

As a result, I would hold that the trial court improperly granted the adoption of B.T.M. without J.R.'s consent to the adoption.