NOT DESIGNATED FOR PUBLICATION

No. 120,204

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Application to Adopt A.T.V and A.A.V.

MEMORANDUM OPINION

Appeal from Finney District Court; RICKLIN PIERCE, judge. Opinion filed May 24, 2019. Affirmed.

*Margaret M. Schultz*, of Schultz Law Office, P.A., of Garden City for appellant natural father.

*Jaskamal P. Dhillon*, of Jaskamal P. Dhillon, P.A., of Garden City, for appellee adoptive father.

Before HILL, P.J., BRUNS, J., and BURGESS, S.J.

PER CURIAM: The father of two children appeals the district court's grant of a stepfather's petition to adopt his children. He contends the district court erred by:

- finding he failed to pay much of his court-ordered child support;
- his contacts with his children were merely incidental;
- it was in the best interests of the children for Stepfather to adopt them; and
- his trial counsel was ineffective.

Even though some claims about Father were disputed, the record on appeal supports the district court's findings. We decline Father's invitation to reweigh the evidence. As for his claim of ineffective assistance of counsel, made for the first time on appeal, we conclude that Father has not shown anything in the appellate record that, on its own, has shown his lawyer's performance was so deficient that it prejudiced him. We affirm the adoption.

1

*We summarize the evidence in the case history.*

This case began when Stepfather filed a petition to adopt his wife's minor children, A.T.V. and A.A.V, and to terminate Father's parental rights. Mother consented to the adoption. Father did not. The parties submitted evidence in a trial to the court.

Mother and Father were never married and separated in 2009. A parenting plan was originally established in 2010 but Father seldom visited with the children. A new parenting plan was established by mediation and filed in 2016.

As for finances, the court ordered Father to pay $380 per month for child support, which he paid inconsistently. In 2016, he paid $247.53. In 2017, he paid $799.73. In 2018, through the end of July, he paid $574.69. Father was ordered to provide health insurance for the children, but he never did. The children did have health insurance provided by the State.

Father was incarcerated for various periods through the relevant years:
- August 22, 2016 – August 27, 2016
- October 10, 2016
- January 8, 2017 – April 11, 2017
- July 23, 2017
- September 9, 2017 – October 11, 2017
- December 1, 2017 – May 22, 2018

Time spent with Father was minimal for these children. Father began exercising his parenting time in May 2016, but quit in July 2016, after Mother asked him for help buying school supplies for the children. During that parenting time, he had the children for a week at a time. Father exercised no parenting time with the children in 2017. From

June 22, 2018, to July 23, 2018, Father had daily visits with the children and one overnight visit. At that point, Father stopped visitation. He called once or twice. Father never attended a parent-teacher conference. Except for attending one concert in 2016, Father made no contact with the school nor attended any school functions.

Mother testified she moved only once during the two-year period before the petition was filed. She did not hide her whereabouts, and she kept the same phone number. She testified she never tried to prevent or interfere with Father exercising visitation in accordance with the parenting plan. On one occasion, in June or July 2018, Mother asked Father to help discipline the children. Mother testified that Father often moved, or was in jail, and changed his phone number; it was difficult keeping in touch with him.

V.B. testified that she had known Mother her whole life, Father for 14 to 15 years, and Stepfather for 6 to 7 years. She told the court that there was a healthy relationship between Stepfather and the children. V.B.'s husband had coached the children in basketball for five years. She often saw Mother and Stepfather at practices and games, but never saw Father there. V.B. testified she saw the children a few times a week. She had seen Stepfather with the children at birthday parties, family benefits, stores, sporting events, and restaurants during the past two years; but had not seen Father with the children.

B.S., Stepfather's mother, testified that she shared an apartment with Stepfather, Mother, and the children from 2014 to November 2017. She worked full-time and some nights and weekends. When she was home, she never saw Father visit the children and could not remember Father ever calling to talk to the children.

3

Stepfather testified that he had worked for the same company for 10 years. He married Mother in March 2018 but they had been together for seven years. He first met the children when they were 2 and 3 years old.

Father testified he had five children, but had no contact with his youngest child. He testified he had a GED and was currently employed at WW Drilling. He admitted he had no visits with the children in 2017. He explained he was incarcerated until April and then worked in North Dakota. He testified he would try to see his children whenever he was in town, but he worked out of town a lot. He did not believe that the court should tell him when he could see his children.

Father testified that Mother denied him access to the children, but he never went to mediation or court to enforce his visitation rights. He testified that several times he needed a civil standby—the local police—present to avoid a confrontation with Mother when he visited his children because Mother would not let him see them. He recalled one time when he saw the children playing outside after he had just gotten back into town, but Mother did not allow him to visit them. He testified that he asked Mother about calling the children on their birthdays, but got no response from her. He testified he told Mother whenever he had changed his phone number or address.

Even though Father's driving license was suspended before August 2018, he admitted that he drove his children without a valid license in June and July 2018. In the past two years, he had been convicted of a third DUI and misdemeanor criminal damage to property.

The court found that Father had failed to provide a substantial portion of his court-ordered child support during the two years preceding the filing of the petition for adoption. The court thus applied the rebuttable presumption in K.S.A. 2017 Supp. 59-2136(h)(3) and found that Father had failed or refused to assume the duties of a parent.

4

The court also found that Father did not overcome the rebuttable presumption. The court disregarded Father's visitation with the children in 2016, finding it amounted to merely incidental visitation when looking at the entire 24-month period. The court also found it was in the best interests of A.T.V. and A.A.V. that Stepfather adopt them. The court terminated Father's parental rights and granted the petition for adoption.

*We review the rules we must follow.*

Parentage is not interminable. When a parent has not accepted some measure of responsibility for his or her child's future, the Constitution will not protect that parent's mere biological relationship with the child. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1060, 190 P.3d 245 (2008).

The marriage of two parents is significant. Not all "presumed fathers" under the Kansas Parentage Act fall within the scope of the stepparent adoption provisions of K.S.A. 2017 Supp. 59-2136(d). Subsection (d) only includes presumed fathers in a marriage relationship. *In re Adoption of P.Z.K.*, 50 Kan. App. 2d 617, 620-21, 332 P.3d 187 (2014). In stepparent adoption cases where (d) does not apply, then (h) must be applied. *In re Adoption of C.A.T.*, 47 Kan. App. 2d 257, Syl. ¶ 5, 273 P.3d 813 (2012). Mother and Father were unmarried so subsection (h) applies.

When a district court terminates a person's parental rights based on factual findings made under K.S.A. 2017 Supp. 59-2136(h)(1), those factual findings will be reviewed on appeal to determine if, after reviewing all the evidence in the light most favorable to the prevailing party, the findings were highly probable—supported by clear and convincing evidence. When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010).

Adoption statutes are strictly interpreted in favor of maintaining the rights of the natural parents where the statute is being used to terminate the right of a natural parent without consent. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010); *In re A.S.*, 52 Kan. App. 2d 173, 177-78, 364 P.3d 1203 (2015). The party seeking to terminate a parent's rights has the burden of proving by clear and convincing evidence that termination is appropriate under K.S.A. 2017 Supp. 59-2136. *In re Adoption of Baby Girl P.*, 291 Kan. at 430.

When a nonconsenting parent is incarcerated and thus unable to fulfill the usual parental duties performed by unrestrained parents, the adoption court must decide whether the parent has sought the opportunities and options which could be available to perform those duties to the best of his or her abilities. *In re Adoption of S.E.B.*, 257 Kan. 266, 273, 891 P.2d 440 (1995). If an incarcerated parent has made reasonable efforts to contact and maintain a continuing relationship with his or her children, it is up to the trial court to determine whether such efforts are sufficient. *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987).

The applicable statute, K.S.A. 59-2136, was amended effective July 1, 2018. L. 2018, ch. 118 § 19. Here, the district court found that because the petition for adoption was filed on April 26, 2018, the prior version of the statute applied. The court also found that subsection (h) rather than subsection (d) applied because Mother was never married to Father. The court found that the two-year "lookback period" was from April 26, 2016, to April 26, 2018. Those findings are unchallenged on appeal.

*Evidence supports the court's child support findings.*

The district court could terminate Father's parental rights if it found by clear and convincing evidence that Father had "failed or refused to assume the duties of a parent for

6

two consecutive years next preceding the filing of the petition" for adoption. K.S.A. 2017 Supp. 59-2136(h)(1)(G). In making this determination a presumption can arise:

> "there shall be a rebuttable presumption that if the father, after having knowledge of the child's birth, has knowingly failed to provide a substantial portion of the child support as required by judicial decree, when financially able to do so, for a period of two years next preceding the filing of the petition for adoption, then such father has failed or refused to assume the duties of a parent." K.S.A. 2017 Supp. 59-2136(h)(3).

The key is what is meant by the phrase, "a substantial portion of the child support." Our courts have approached this subject with great care.

The provisions of K.S.A. 59-2136 must be strictly construed in favor of maintaining the rights of natural parents. "Father's nonperformance must literally meet all of the stated conditions of the statutory presumption." *In re J.M.D.*, 293 Kan. 153, 172, 260 P.3d 1196 (2011). In *In re J.M.D.*, the statutory presumption did not apply when Father had paid all of his court-ordered support for the last 10 months before the adoption petition was filed. 293 Kan. at 172. When applying the statutory presumption the courts are required to take into consideration the period of time that the parent was incarcerated and unable to support the children. See *In re Adoption of S.E.B.*, 257 Kan. at 274. But the parent must provide child support when financially able to do so. *In re H.B.S.C.*, 28 Kan. App. 2d 191, 200-01, 12 P.3d 916 (2000). Postpetition payments are not considered because "[c]hildren need support every month, not just in a lump sum to ward off a pending adoption." *In re Adoption of J.D.W.*, No. 119,788, 2019 WL 638034, at *5 (Kan. App. 2019) (unpublished opinion).

The facts direct us to the law that applies. A "substantial portion" assumes more than nominal or casual efforts; it means something of real worth and importance; of considerable value. *In re Adoption of B.M.W.*, 268 Kan. 871, 883-84, 2 P.3d 159 (2000), *abrogated on other grounds by In re J.M.D.*, 293 Kan. at 153.

7

Some examples in caselaw are helpful on this point. The Kansas Supreme Court found that payment of 64 percent of a support obligation was substantial, even when paid involuntarily in response to a contempt order. *In re Adoption of B.M.W.*, 268 Kan. at 883-84. Payment of 53 percent of the child support obligation plus health insurance coverage for more than half of the two-year period was considered substantial in *In re M.R.G.*, No. 99,892, 2008 WL 4966493, at *7 (Kan. App. 2008) (unpublished opinion). Payment of 23 percent plus medical insurance coverage was considered substantial by two of the judges for different reasons in *In re C.R.D.*, 21 Kan. App. 2d 94, 99-100, 102-03, 897 P.2d 181 (1995), *abrogated by In re Adoption of G.L.V.*, 286 Kan. 1034, 190 P.3d 245 (2008). But payment of 31 percent of the child support and no medical insurance coverage was not considered substantial in *In re Adoption of R.W.B.*, 27 Kan. App. 2d 549, 555, 7 P.3d 306 (2000). That panel found that a "substantial portion" is at least 69 percent of court-ordered support. 27 Kan. App. 2d at 555. We turn now to what the district court found here.

The court found that Father had failed to provide a substantial portion of his court-ordered child support during the preceding two years. For the two-year period, Father owed $9,120, but paid only $842.30 or 9 percent of what he owed between April 2016 and April 2018. The court considered Father's jail time. "Even if his child support was reduced by 38%, the time spent by [Father] in incarceration, he only paid 14% of what he owed in child support for that period of time[. He paid] $842.30 on a support obligation of $5,654.40." In other words, the court reduced by 38 percent what Father owed for child support and even with the reduced figures he had only paid 14 percent of what he owed.

The district court found that from January to April 26, 2018, Father could not work because he was incarcerated. During 2017, Father was incarcerated for 159 days (43 percent of the year) but paid only $799.73 or 17 percent of the $4,560 he owed. If the amount of child support owed was reduced by 43 percent, the total child support

8

obligation for 2017 would be $2,599.20, and Father paid only 30 percent. From April 26, 2016, to December 31, 2016, Father was incarcerated for only seven days. For that time, he owed $3,040, but paid only $42.57 (1 percent). Father also did not provide court-ordered health insurance. The court found Father had a G.E.D., could work, and could make a good living. Father never testified he was unemployed when he was not incarcerated.

The evidence also shows Father's ability to pay when he paid $1,093.93 in child support for June, July, and August 2018 (after the petition for adoption was filed). Considering all of this, the court applied the rebuttable presumption in K.S.A. 2017 Supp. 59-2136(h)(3). We find no error in that conclusion.

Father agrees with the district court's numbers. But he contends the district court erred by finding he failed to provide a substantial portion of child support and applying the rebuttable presumption under K.S.A. 2017 Supp. 59-2136(h)(3). He argues he paid child support when he was able, but was unable to provide medical coverage or support when he was not working or in jail.

We remain unpersuaded. The district court subtracted the time Father was incarcerated out of the equation entirely and still found that Father had only paid 14 percent of his child support obligation and had not provided health insurance. There was evidence from Father that he was employed when out of jail. Father generally contended that his employment out-of-state is what kept him from seeing his children when he was not incarcerated. Father testified he had a G.E.D., and he did make child support payments after the adoption petition was filed. Thus, considering the facts and the caselaw, the district court did not err in finding clear and convincing evidence that Father failed to provide a substantial portion of his court-ordered child support when he could do so.

9

In an argument that tries to shift his responsibility, Father argues the children were not harmed by his failure to provide health insurance because they had medical coverage through the State of Kansas. But determining whether the children were harmed by Father's failure to provide support is not the question. See K.S.A. 2017 Supp. 59-2136(h)(3). It was Father's responsibility to provide health insurance, not the State's. He failed to live up to his responsibility and he could have done so.

While the statutory presumption applies, it is clear that even if all the conditions for the statutory presumption were not met, the district court could have considered Father's failure to meet his child support obligations as part of all the circumstances in determining whether Father had assumed his parental duties. See *In re J.M.D.*, 293 Kan. at 167. There is certainly sufficient evidence in this record to support the district court's findings and there is no reason to reverse on this point.

*Father did not overcome the presumption.*

The court found that Father did not overcome the rebuttable presumption in K.S.A. 2017 Supp. 59-2136(h)(3). The court regarded Father's visitation with the children in 2016 as merely incidental considering the entire 24-month period. The court found Father exercised visitation for about two or two-and-a-half months out of a possible 24 months. He had no contact with the children the entire year of 2017. Father did not testify that he sent the children any cards, letters, or gifts. He only attended one school event and never attended a parent-teacher conference. He never contacted the children's school to get information about the children, their activities, or their school events.

To the contrary, Father contends his contact with the children from May 2016 to July 2016, and from June 2018 to July 2018, was more than incidental. He had the children for a week at a time from May 2016 to July 2016, he attended a school concert in 2016, he disciplined the children in July 2018, and had daily visitation with the

10

children from June 22, 2018, to July 23, 2018. He contends he did not exercise parenting time from August 2016 to December 2016, or in 2017, because he was incarcerated and then working out-of-state.

Father's June and July 2018, contacts with the children are outside the two-year look-back period. But his contact with the children from May to July 2016, was more than incidental. He had the children for a week at a time during that period. This was regular and significant contact with the children, but only for two to three months.

Even so, if Father's contacts with the children were more than "incidental," the contacts still need to be enough to rebut the presumption raised by the failure to provide child support. *In re Adoption of D.R.B.*, 21 Kan. App. 2d 790, Syl. ¶ 5, 908 P.2d 198 (1995).

Whether a parent's contacts are enough to rebut the presumption is a question of law. *In re D.R.B.*, 21 Kan. App. 2d at 794. In *In re D.R.B.*, father's visits were "somewhat sporadic," but he had visited the children at least 25 times during the 2-year period. He visited them often on weekends when he was working within driving distance to Kansas City, took them to St. Louis to visit his relatives, took them to Worlds of Fun and Oceans Fun, and attended some of his son's sporting events. While more than incidental, his contacts could not rebut the presumption. 21 Kan. App. 2d at 797.

Here, Father's contacts with his children do not overcome the presumption. In April 2016, Father and Mother got a new mediated parenting plan established. Father then exercised his parenting time for only a couple of months. The only other direct contact was a school concert sometime in 2016. The next time Father exercised any significant parenting time was after the petition for adoption was filed.

11

He called the children only once or twice. He did not send them birthday cards, letters, or gifts even when he was not incarcerated. He did not contact them for the entire year of 2017. He showed no interest in their health or schooling. At trial, Father claimed that mediation and court proceedings were unnecessary and he did not need the court to tell him when to see his children. But Father seems only to exercise his parenting time after mediation or court proceedings are instigated.

Father claims that Mother prevented him from contacting the children. He contends he wanted to call the children on their birthdays, but got no response from Mother. He contends he tried to contact the children several times, but got no response from Mother. It is true that evidence that a parent interfering with the other parent's right to maintain contact with their children can be considered in determining whether the father failed to assume his parental duties. See *In re Adoption of F.A.R.*, 242 Kan. at 237. The trial court did just that.

Here, the district court found that although Father blamed Mother for preventing him from seeing the children, it was Father who was unreliable and did not believe the court should tell him when he could see his children. It was not just a matter of Father not exercising his generous visitation rights.

We do not reweigh the evidence. See *In re Adoption of B.B.M.*, 290 Kan. at 244. Though Father disputed it, clear and convincing evidence in the record supports the district court's findings. We find no error here.

*The court did not err when it made a best interests finding.*

In considering whether parental rights should be terminated, a court may "[c]onsider and weigh the best interest of the child." K.S.A. 2017 Supp. 59-2136(h)(2)(A). The best interests determination is not required by the plain language of

12

the statute. *In re Curtis N.*, No. 112,702, 2015 WL 1947464, at *7 (Kan. App. 2015) (unpublished opinion). The Supreme Court has spoken clearly on this point that it is another discretionary finding a court may make:

> "The additional language expressly authorizing a court to consider the best interests of the child in determining whether to grant a stepparent adoption provides the court with additional discretionary powers to consider the best interests of the child in denying the adoption—even where a natural parent has not assumed the duties of a parent as articulated by this court—for unique reasons. For example, a court may determine, based upon testimony of the child or other evidence, that the child desires to remain the son or daughter of the natural parent based upon the parent's promise of commitment to the child, based upon friction in the stepparent family, or a pattern of instability in the stepparent history." *In re Adoption of G.L.V.*, 286 Kan. at 1064-65.

It is true that the best interests of a child may not be the *sole basis* for the termination of parental rights because, otherwise, courts could seek to find better families for children whose families have financial or other difficulties. *In re Adoption of C.L.*, 308 Kan. 1268, 1280, 427 P.3d 951 (2018). But the legal preference that a natural parent raise his or her child does not extend to parents who fail to assume the duties of a parent. *In re Adoption of G.L.V.*, 286 Kan. at 1061.

The court found it was in the best interests of these two children that Stepfather adopt them so they would have a stable home environment, a reliable and responsible parent who would spend time with them at home, go to their school and sporting activities, and was a reliable source of financial support. There is certainly evidence in the record that Stepfather can so provide for the children.

But Father contends the district court erred by weighing who would be the better parent. He argues he should not lose his parental rights simply because a stepparent has better resources. To do so, he contends, would be contrary to our state's public policy that

the best interests of children are served by fostering relationships with their natural parents.

That is not a compelling argument because the district court had already found that Father had not assumed the duties of a parent. The public policy simply does not apply to Father under these circumstances. After making its failure analysis, the district court simply conducted an additional discretionary analysis of the best interests of the children. This was consistent with our caselaw. We find no error here.

*We are unpersuaded by Father's argument about his counsel.*

For the first time on appeal, Father contends his trial counsel was ineffective. He argues this court can consider the issue for the first time on appeal based only on the appellate record.

Father first contends that his counsel did not even know who his client was at the beginning of trial because counsel did not recognize Father, and counsel failed to request a continuance to prepare for trial. At the beginning of trial, the following conversation occurred:

> "THE COURT: Okay. At this time, Mr. Spencer, do you know why your client is not present in the court?
> "MR. SPENCER: I do not know, Your Honor. I do know—
> "THE COURT: I think he's coming in right now, here. Is that him?
> "MR. SPENCER: I don't know. Mr. V[ ]?
> "THE COURT: Are you Mr. V[ ]?
> "THE RESPONDENT: Yes, sir.
> "MR. SPENCER: Let me visit with him a moment, Your Honor—
> "THE COURT: Okay.
> "MR. SPENCER:—because we may—we may have a situation we can—

14

"THE COURT: So we'll take a brief recess."

While Father argues that this proves the lawyer did not even know who he was, that could be a mischaracterization of the record. Instead, the statement could mean that counsel could not see who was entering the courtroom. This demonstrates the difficulty of relying on a cold appellate record when making a claim such as this.

The record shows that Father's attorney did communicate or tried to communicate with him before trial. On May 15, 2018, the court appointed an attorney to represent Father. The attorney, Doug Spencer, entered his appearance on May 16, 2018. On June 11, 2018, Spencer and Father both appeared in court. On July 19, 2018, Spencer filed a notice of withdrawal "due to the total failure by respondent to communicate." But Spencer continued to represent Father. In August 2018, Spencer filed notice of service of answers to Stepfather's discovery requests. And Spencer represented Father at trial.

Father next complains that Spencer called no witnesses and presented no evidence on his behalf. And Spencer cross-examined Father for "such a short time it amounted to only four pages in the transcript."

The record confirms Spencer called no witnesses. Spencer said he intended to call Father, but Father had already been called by Stepfather's counsel. Spencer's cross-examination of Father was indeed fewer than four pages of the transcript. Spencer subpoenaed a witness, Tiffany McDermott, of the Garden City Police Department. For some reason unclear in the record, Spencer did not call her to testify. But we question the significance of this claim. Father names no witnesses who should have been called, any evidence that should have been admitted through their testimony, or any testimony that Spencer should have elicited from him or McDermott. Thus, we cannot say that Spencer was deficient or that Father was prejudiced.

15

Father next contends that Spencer did not know which law applied, because he based his arguments on K.S.A. 2017 Supp. 59-2136(d), and he should have argued for the amended version of K.S.A. 2018 Supp. 59-2136(h) to be applied because it removed the best interests of the child standard.

The problem with Father's argument is that on appeal, he does not even argue the district court erred by applying the earlier version of the statute, and he admits that "K.S.A. 59-2136(h) was correctly applied by the District Judge." The record shows that in closing, Spencer argued that K.S.A. 59-2136 should be strictly construed in Father's favor. Spencer argued that the period Father had failed to exercise his parental rights was less than two years because Father complied with the visitation plan until July 24, 2016. He referred the court to several relevant cases. In his suggested findings of fact and conclusions of law, Spencer contended that the July 2018 amendment of K.S.A. 59-2136 could not be applied because the amendment affected substantive rights. He did not argue for subsection (d) to be applied—rather, he cited both subsections (d) and (h).

Even if Spencer did argue subsection (d) applied rather than subsection (h), Father suffered no prejudice because the controlling issue—whether Father failed to assume the duties of a parent for two years preceding the filing of the petition for adoption—was the same regardless of whether the court applied (d) or (h). See *In re Adoption of R.L.J.*, No. 109,257, 2013 WL 5507486, at *4 (Kan. App. 2013) (unpublished opinion). Father admits there are substantial similarities between the two sections.

Father asks this court to decide the ineffective assistance counsel argument based on the appellate record, with no fact-finding on the issue by the district court. Father has not pointed to anything in the appellate record that, on its own, affirmatively shows deficient performance or prejudice to his case.

A claim of ineffective assistance of counsel requires:

16

- that the performance of defense counsel was deficient under all the circumstances; and

- prejudice–that there is a reasonable probability of a different result without the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

Father has not shown us either.

Affirmed.