NOT DESIGNATED FOR PUBLICATION

No. 114,717

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER LEE STAPLES,
*Appellant.*


MEMORANDUM OPINION


Appeal from Ford District Court; E. LEIGH HOOD, judge. Opinion filed December 23, 2016. Affirmed in part, sentence vacated, and case remanded with directions.


*Caroline Zuschek*, of Kansas Appellate Defender Office, for appellant.


*Kathleen Neff*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before MALONE, C.J., GREEN and LEBEN, JJ.


LEBEN, J.: One evening in Dodge City, in August 2014, 12-year-old K.C. spent the night at her friend L.S.'s home. The two girls slept on a futon in the basement, but at some point in the night, L.S. woke up and couldn't find K.C., so she went upstairs, told her parents that she couldn't find K.C., and went to sleep in her bedroom. L.S.'s dad, Christopher Lee Staples, went to look for K.C., and he found her asleep on the basement floor, partially underneath the futon. He picked her up and placed her on the futon. According to K.C., he then kissed her, put his finger in her vagina, and kissed and touched her breasts. Staples denied K.C.'s accusation and said that he hadn't touched her except to move her from the floor to the futon, but his DNA was found on K.C.'s left

breast, and a jury convicted him of aggravated indecent liberties with a child. The district court sentenced Staples to life in prison with no chance of parole for 25 years.

Staples appeals his conviction and sentence on three grounds. First, he argues that the district court should have granted his motion requesting a psychological examination of K.C. But such a decision—whether to order a psychological examination of a complaining witness in a sex-crime case—rests soundly in the district court's discretion. Under the facts of this case, we cannot say that the district court abused that discretion because there was very little evidence to support Staples' claims that K.C. was mentally unstable, had previously lied about sexual abuse, and generally wasn't trustworthy.

Second, Staples argues that the prosecutor made two improper comments during her closing argument that prejudiced the jury and deprived him of his right to a fair trial. But even if one or both comments went beyond the wide latitude that prosecutors have when discussing the evidence, there's no reasonable chance that they impacted the jury's verdict.

Third, Staples argues that the district court didn't follow the law when it refused to impose a shorter prison sentence because it considered each of Staples' mitigating factors one at a time rather than all together. Given the severity of the sentence—lifetime imprisonment with no possibility of parole for 25 years—we think it important that everyone can be sure the district court has considered the matter under the proper standards. Because we cannot make that determination from the record before us, we will vacate the sentence and remand for resentencing, though the district court could still enter the same sentence if it chooses to do so.

FACTUAL AND PROCEDURAL BACKGROUND

Alisha and Justin Killian, K.C.'s mom and stepdad, played on a softball team with Staples and his wife, Kristy. Staples, Kristy, and Alisha all worked at Budweiser, which sponsored the softball team, and they sometimes brought their kids to practices and games, where K.C. would play with L.S., the daughter of Staples and Kristy. K.C. and L.S. had also played together on a kids' softball team that Kristy coached. On August 23, 2014, K.C. and L.S. attended the Budweiser softball players' family pool party with their parents.

Except for K.C.'s allegations against Staples, there's no dispute about the other details of the evening. The party was a regular summertime family gathering: several families attended, the adults ate and drank, and the kids played on a trampoline and swam in the pool. K.C. and L.S. wanted to have a sleepover at L.S.'s home, and their parents agreed. While the parents remained at the pool party, a family friend took K.C. and L.S. to L.S.'s home around 10 or 10:30 p.m.

When Kristy and Staples came home around 12:30 a.m., K.C. and L.S. were watching movies on the couch in the living room. Kristy and Staples told them it was time to go to bed, so the girls went to sleep on a futon in the basement. The adults then went out to the back porch with one of their neighbors; Staples had another beer and a few cigarettes, and Kristy had some water. Kristy and Staples eventually went to bed around 1:30 a.m.

In the basement, K.C. had a hard time falling asleep because the television was on; she didn't know how to turn it off and couldn't find the remote. She decided to sleep on the floor, underneath the futon, because it was darker and quieter. She had a blanket with her on the floor, and she was wearing pajamas, a bra, and underwear.

L.S. had fallen asleep on the basement futon right away, but at some point she woke up and couldn't find K.C. L.S. went upstairs to the second floor and woke her parents, told them she couldn't find K.C., and went to sleep in her bedroom.

Staples then got out of bed and went to look for K.C. When he went down to the basement, he saw her sleeping on the floor, partially underneath the futon, face down with her knees bent under her. He picked her up and laid her down on the futon. According to K.C., Staples then laid down beside her, put his finger in her vagina, touched and kissed her breasts, and French-kissed her. She said that he had tasted like cigarettes and beer. She said that she had tried three times to get away and that when she did, she ran upstairs and told Kristy that Staples had touched her.

Staples denied touching K.C. inappropriately. He said that after he had picked her up, he had sat on the futon and told her that L.S. was sleeping in her bed and that she could go up there if she wanted to. He said that K.C. had run upstairs while he was turning off the basement television.

No one disputes what happened next. K.C. wanted to go home but didn't want Staples to drive her. Staples called K.C.'s stepdad, Justin, around 2 a.m., and Justin came to pick her up. Staples told Justin that he had picked K.C. up and put her on the futon but that nothing else had happened. Justin told Staples that in the past, K.C. had accused him of touching her breasts when he was playing and wrestling with her and her siblings.

When K.C. got home, she told her parents the details of what had happened, and they called their family therapist sometime that morning. K.C. had been seeing the therapist for attention-deficit/hyperactivity disorder and anger problems and was on two medications for those conditions, Risperidone and Adderall. The therapist then called the police. K.C. underwent a sexual-assault exam at 5:30 p.m. that same day (she hadn't changed her clothes or taken a shower). Among other things, the sexual-assault nurse

4

collected K.C.'s clothes, took a blood sample, swabbed K.C.'s neck and breasts, and did a genital exam. Forensic testing showed Staples' DNA on K.C.'s left breast.

Before trial, Staples asked the court to order a psychological evaluation of K.C., alleging that she was mentally unstable and untrustworthy because she had been seeing a therapist and had previously lied about being sexually abused. The district court denied Staples' motion, concluding that there wasn't enough evidence to support it.

Various police officers, the sexual-assault nurse, K.C.'s parents, Kristy, L.S., K.C., and Staples all testified, generally as we've already recounted, and the jury acquitted Staples of rape but convicted him of aggravated indecent liberties with a child. The district court denied Staples' motions for acquittal and a new trial. Staples filed a departure motion asking the court to impose a shorter sentence. The district court found that there weren't any substantial and compelling reasons to impose a shorter sentence and gave Staples the sentence provided for by statute: life in prison without the possibility of parole for 25 years.

Staples now appeals to this court.

ANALYSIS

I. *The District Court Didn't Abuse Its Discretion When It Denied Staples' Motion for a Psychological Evaluation of K.C.*

Staples first argues that the district court should have granted his motion and ordered a psychological evaluation of K.C.

The decision to order a psychological evaluation of a complaining witness in a sex-crime case—here, K.C.—rests soundly in the district court's discretion. *State v.*

*Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979). Thus, we review the district court's denial of Staples' motion for an abuse of that discretion. *State v. Berriozabal*, 291 Kan. 568, 580, 243 P.3d 352 (2010). A district court abuses its discretion if no reasonable person would agree with its decision or if its decision is based on an error of law or fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). The burden is on Staples to show that the district court abused its discretion. *State v. Rojas-Marceleno*, 295 Kan. 525, 531, 285 P.3d 361 (2012).

The district court can order a psychological evaluation of a complaining witness in a sex-crime case only if it determines, based on the totality of the circumstances, that the defendant has shown compelling reasons to justify the evaluation. *Berriozabal*, 291 Kan. at 581. This is a rigorous standard, and the court usually considers six nonexclusive factors related primarily to the existence of corroborating evidence and the witness' mental instability and trustworthiness:

> "(1) whether there was corroborating evidence of the complaining witness' version of the facts,
>
> "(2) whether the complaining witness demonstrates mental instability,
>
> "(3) whether the complaining witness demonstrates a lack of veracity,
>
> "(4) whether similar charges by the complaining witness against others are proven to be false,
>
> "(5) whether the defendant's motion for a psychological evaluation of the complaining witness appears to be a fishing expedition, and
>
> "(6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth." 291 Kan. at 581.

6

Simply alleging mental instability, without more, isn't enough for a court to order a psychological evaluation—there must be demonstrable evidence of a mental condition that requires further investigation. 291 Kan. at 581. Additionally, occasional inconsistent statements from the complaining witness don't compel the court to order a mental evaluation. 291 Kan. at 581.

Here, Staples argues that all of these factors weigh in favor of ordering a psychological evaluation of K.C. First, he claims that very little evidence corroborated K.C.'s allegations, but as the district court found, that's simply not true. Most importantly, physical evidence supports K.C.'s allegation that Staples kissed and touched her breasts because Staples' DNA was found on K.C.'s left breast, and foreign but ultimately unidentifiable DNA was found on K.C.'s right breast. K.C.'s story gains further support when we consider that the other details of the evening, from the pool party and the sleepover to the way Staples picked K.C. up and placed her on the futon, were all corroborated and agreed upon by all the parties, including Staples. Additionally, K.C.'s story hasn't changed over time: she told her parents, the police, and the jury the same story.

Second, Staples claims that K.C. lacked mental stability because she had been seeing a therapist, had attention-deficit/hyperactivity disorder and unspecified anger issues, and was taking Adderall and Risperidone. The district court found that this was simply insufficient evidence of mental instability to require further investigation. Merely seeing a therapist isn't evidence of mental instability. See *State v. McIntosh*, 274 Kan. 939, 944, 946, 58 P.3d 716 (2002) (finding victim's bedwetting, diagnosis of attention-deficit disorder, behavioral problems at school, and resentment for absence of biological father insufficient to support mental instability); *State v. Coggs*, No. 104,934, 2012 WL 5364658, at *3 (Kan. App. 2012) (unpublished opinion) (finding that a bipolar diagnosis, on its own, didn't show a lack of mental stability). That K.C.'s parents called her therapist

7

before calling the police and that the therapist came to K.C.'s home didn't persuade the district court otherwise—no matter how long a person has been seeing a therapist or how close that relationship may be, seeing a therapist by itself doesn't prove the existence of mental instability requiring further investigation.

Staples cites to a secondary source for the proposition that Risperidone is an antipsychotic medication, perhaps hoping to suggest that K.C. was psychotic in some way. That information was never presented to the district court and therefore isn't part of the record on appeal. See Supreme Court Rule 6.02(a)(4) (2015 Kan. Ct. R. Annot. 41); *Romkes v. University of Kansas*, 49 Kan. App. 2d 871, 886, 317 P.3d 124 (2014) (including documents in the appendix of a brief does not make those documents part of the record that can be considered for appellate review). But even if we consider it, we can't make the leap that Staples suggests—all we actually know is that K.C. took Risperidone, not why she took it. Drugs are often prescribed for off-label use; we can't know why a doctor prescribed this drug for K.C. without evidence specific to K.C.

Third, Staples argues that K.C. lacked veracity because she had a tendency to make up stories. He points to three facts: (1) K.C.'s stepdad told Staples that K.C. had accused him of touching her breasts when he had been wrestling with her and her siblings; (2) K.C.'s mom had allegedly said, before this incident, that K.C. makes up crazy stories; and (3) K.C.'s stepdad testified at trial that K.C. once falsely accused him of hitting her. But the district court found that these bare allegations weren't enough to show that K.C. was so untrustworthy that a psychological evaluation was warranted.

Perhaps because of how thin this evidence is, Staples doesn't separately argue the fourth *Berriozabal* factor—whether the complaining witness had previously made similar charges that have been proven to be false—instead collapsing it into the veracity question. These allegations about K.C. making up stories were not enough to persuade the district court that there was substantial evidence that K.C. had previously made

similar false allegations. *Cf. State v. Bourassa*, 28 Kan. App. 2d 161, 166-67, 15 P.3d 835 (1999) (holding that the district court abused its discretion by denying the defendant's motion for a psychological evaluation where the complaining witness had recently accused her father of sexual abuse, had mutilated two kittens the previous summer, had a tendency to soil herself, was on Prozac and in counseling, and had testified that she had been raped in a van while sitting next to her sister, who hadn't mentioned anything about rape in her testimony).

Fifth, Staples insists that his motion wasn't a "fishing expedition" because K.C. had heard a similar story of sexual abuse from her cousin (who had been sexually assaulted at a sleepover and had recently come to live with K.C.) and because K.C. had watched procedural crime dramas on television—suggesting that K.C. used these sources to make up this story. He claims that these two facts, along with everything else, gave him good reason to believe that K.C. was untrustworthy and to request a psychological evaluation. The district court found this unconvincing, given the thin evidence Staples provided. In light of the number of crime dramas on television and the statistics about the number of women who have been sexually assaulted, watching television or knowing someone who has been sexually assaulted are not sufficient reasons for a court to order a psychological evaluation of a witness.

Sixth, Staples claims that K.C. didn't understand what it meant to tell the truth, pointing to K.C.'s statement to police about the importance of telling a consistent story. The record on appeal doesn't include K.C.'s exact statement, but Staples' trial attorney recounted it in her closing statement at trial:

> "Remember in her video [K.C.] says something interesting. She says adults know how to tell the same story. She makes that statement regarding Mr. Staples, and says he's probably going to be able to tell the same story over and over again, and that's how people will think he's telling the truth.

9

"The problem with [K.C.'s] thought process, and the problem with that, is that she hasn't realized that she has that backwards. The reason someone's story stays the same is because it is the truth. It's because they're remembering facts. It's because they're remembering what happening. They're not trying to remember the story they just told."

The district court found that nothing about K.C.'s statement indicated that she didn't understand the requirement to tell the truth. We agree. Simply because K.C. recognized the importance of consistency doesn't mean that she didn't understand the difference between truth and a lie.

While the six factors listed in *Berriozabal* aren't exclusive, Staples hasn't suggested any other compelling circumstances that would justify ordering a psychological evaluation of K.C. See 291 Kan. at 582. And it's rarely an abuse of discretion for a district court to refuse to order a psychological examination. *Gregg*, 226 Kan. at 489; see, *e.g.*, *Berriozabal*, 291 Kan. at 582 (finding evidence of unstable home environment insufficient to support allegation of mental instability and finding one possible incident of lying about defendant's former stepdaughter's virginity insufficient to support lack of veracity); *State v. Price*, 275 Kan. 78, 81, 88, 61 P.3d 676 (2003) (finding no compelling reasons to justify examination when evidence indicated victim made untruthful statement to a friend but statement was unrelated to contact with defendant, victim had made no other false allegations of abuse, victim had engaged in prior sexual contact with her stepbrother, and victim referred to herself as a liar in a letter to her mother but later testified she had not been lying about her contact with defendant); *McIntosh*, 274 Kan. at 944, 946 (finding victim's bedwetting, diagnosis of attention-deficit disorder, behavioral problems at school, and resentment for absence of biological father insufficient to support mental instability).

The purpose of a psychological examination of a complaining witness in a sex-crime case is to test the complaining witness' veracity. See *Gregg*, 226 Kan. at 487, 489

(citing *Ballard v. Superior Court*, 64 Cal. 2d 159, 49 Cal. Rptr. 302, 410 P.2d 838 [1966]). One member of the Kansas Supreme Court argued in 2014 that allowing a district court to order these evaluations in sex-crime cases—and only in sex-crime cases—is based on outdated and misogynistic reasoning. See *State v. Simpson*, 299 Kan. 990, 998-99, 327 P.3d 460 (2014) (Moritz, J., dissenting) (noting that the Kansas Supreme Court has refused to extend *Gregg* to non-sex-crime contexts and recommending that Kansas overrule *Gregg*). We, of course, must apply the *Gregg* and *Berriozabal* factors—corroborating evidence, whether the witness has made previous false allegations, whether the witness demonstrates mental instability, and whether the witness knows what it means to tell the truth. We cannot say that the district court abused its discretion by denying the request for a psychological evaluation of K.C. after consideration of these factors. We note too that nearly every piece of information that Staples relies on to argue for a psychological examination actually came out at trial, allowing the jury to do its job and assess K.C.'s veracity.

Of course, Staples' psychological-evaluation motion occurred before the trial, while Staples' brief on appeal cites a lot of evidence from the trial itself to support his argument for a psychological evaluation. The State suggests that we should consider only the evidence that was before the district court at the time of Staples' motion. But the district court specifically told defense counsel at the pretrial hearing that if additional evidence came to light showing the need for a psychological evaluation, defense counsel could renew the motion. Defense counsel didn't renew the motion, but since the court arguably left the issue open, we have considered all the evidence available in the record to reach our conclusion that the district court didn't abuse its discretion. If we were to consider the minimal evidence Staples actually presented at the pretrial hearing, it would simply be easier to conclude that the district court didn't abuse its discretion.

11

II. *No Prosecutorial Error Occurred.*

Staples argues that the prosecutor committed misconduct during her closing argument, prejudicing his right to a fair trial.

Staples and the State both argue this issue under the prosecutorial-misconduct standard from *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004). But the Kansas Supreme Court recently revised that standard in *State v. Sherman*, 305 Kan. ___, 378 P.3d 1060, 1065 (2016). Usually, changes in the law apply to cases that are still on appeal and aren't yet final. *Gaudina v. State*, 278 Kan. 103, 106, 92 P.3d 574 (2004). But the parties in this case haven't had the chance to argue how *Sherman* would apply here; they filed their briefs before *Sherman* came out, and neither party has filed a letter of additional authority. Thus, we follow the lead of our Supreme Court and consider Staples' claims under both standards. See *State v. Kleypas*, 305 Kan. ___, 382 P.3d 373, 435 (2016) (applying both standards because parties hadn't briefed new standard). Staples does not establish reversible error under either one.

Under both standards, analyzing prosecutorial conduct is a two-step process: we first ask whether there was a prosecutorial mistake and, if so, we ask whether the mistake prejudiced the jury against the defendant and denied the defendant a fair trial. *Sherman*, 305 Kan. at ___, 378 P.3d at 1072-75.

The first question is the same under both the old and new standards: were the prosecutor's comments outside the wide latitude that prosecutors have to discuss the evidence? 305 Kan. at ___, 378 P.3d at 1072, 1075. Generally, a prosecutor's statements are permissible as long as they are confined to the evidence and reasonable inferences that can be drawn from the evidence and aren't designed to inflame the passions and prejudices of the jury. *State v. Akins*, 298 Kan. 592, 601-02, 315 P.3d 868 (2014) (prosecutor may not reference facts not in evidence); *State v. Hall*, 292 Kan. 841, 853,

257 P.3d 272 (2011) (prosecutor may not make statements that inflame the passions or prejudices of the jury). *Sherman* renamed but didn't otherwise change this step: if the prosecutor's comments were outside the wide latitude allowed in discussing the evidence, it is prosecutorial *error*, not *misconduct*. 305 Kan. at ___, 378 P.3d at 1064.

The second step, under both standards, considers whether the prosecutor's improper comment prejudiced the jury and denied the defendant a fair trial, requiring the court to reverse the defendant's conviction. 305 Kan. at ___, 378 P.3d at 1072-73. Under the old standard, courts considered three factors to answer this question:

> """(1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors.""" 378 P.3d at 1073 (quoting *Tosh*, 278 Kan. at 93).

These three factors had two aims: to punish and deter bad prosecutorial acts while at the same time protecting the defendant's right to a fair trial. 305 Kan. at ___, 378 P.3d at 1074.

*Sherman* separated these two aims by distinguishing prosecutorial *error* from prosecutorial *misconduct*. 305 Kan. at ___, 378 P.3d at 1074, 1076. After *Sherman*, misconduct occurs when a prosecutor does something beyond negligently making an improper comment—it occurs when a prosecutor acts maliciously or with a gross disregard for the fair-trial rights of the defendant (compare this to the first two *Tosh* factors). 305 Kan. at ___, 387 P.3d at 1078. *Sherman* declared that this true prosecutorial misconduct—which needs to be deterred and punished—should be addressed in a contempt proceeding at the district court, not as part of the direct appeal. 305 Kan. at ___, 378 P.3d at 1078-79.

13

In the direct appeal, after *Sherman*, the appellate court is concerned with whether a prosecutorial error affected the defendant's right to a fair trial; deterring and punishing bad prosecutorial acts is no longer a goal. 305 Kan. at ___, 378 P.3d at 1074-75. As such, *Sherman* streamlined the second step of the prosecutorial-error analysis: when considering whether the error prejudiced the jury and denied the defendant a fair trial, the court now simply applies the traditional constitutional harmlessness test. 305 Kan. at ___, 378 P.3d at 1075. Under that test, an error is harmless when "the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]). This test focuses the appellate inquiry on fairness to the defendant.

Here, Staples argues the prosecutor made two inappropriate statements during her closing argument. In the first statement, the prosecutor described Staples looking at K.C. during the pool party and when she was sleeping on the floor:

> "And, it wasn't the first time that he had seen [K.C.] He had seen her playing around on ballgames. He had watched her at a pool party that night in her little swimming suit, jumping in and out of the pool, jumping in and out of the hot tub. And, he comes downstairs, and he finds her crunched on the floor with her knees under her, and her little rump up in the air. And, he saw an opportunity and he took it."

Second, in response to the defense's argument that the timeline of events didn't make sense, the prosecutor described how sexual acts don't always take very long: "As far as how much time, I think everybody in that jury box knows sex doesn't take a lot of time sometimes. We used to call it wham, bam, thank you ma'am."

14

So under both the old and new standards, we first ask: were these statements outside the wide latitude prosecutors have to discuss the evidence? 305 Kan. ___, 378 Kan. at 1072. Staples argues that the first statement, about him watching K.C., wasn't consistent with the evidence at trial because there wasn't any evidence that he had actually *watched* her at the pool party. But it wasn't disputed that both Staples and K.C. were at the pool party, and K.C. testified that she had been swimming at the party. K.C.'s mom also testified that K.C. had her bathing suit with her and had been swimming. From that evidence, it's reasonable to assume that Staples at least *saw* K.C. while she was swimming at the party.

The choice of the word "watch" does take the prosecutor's statement one step further because it obliquely suggests that Staples had some kind of plan, and there wasn't any actual evidence that Staples *planned* to sexually assault K.C. But the prosecutor's one-time use of the word "watch" is probably not outside the wide latitude prosecutors have to comment on the evidence. See *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000) (prosecutor can craft arguments based on reasonable inferences). The prosecutor immediately went on to characterize this as a crime of opportunity, which undercuts the implication that Staples had a plan.

Second, Staples argues that "wham, bam, thank you ma'am" was designed to inflame the passions or prejudices of the jury. The prosecutor made this statement in direct response to the defense's suggestion, in its closing, that K.C.'s story wasn't believable because the timeline was too short. At sentencing, the prosecutor admitted that it was a poor choice of words, and the district court agreed that the phrasing was "indelicate." It was not necessary to the argument; the prosecutor could have skipped that line and made her point. But is it outside the wide latitude prosecutors have to discuss the evidence? That's a tougher call—it's jarring language in a case involving a 12-year-old victim, and it really had no relationship to the events that K.C. testified to.

15

In sum, it's not clear that either remark was improper at the first step of the analysis, but even if we assume that they were, the next step would be whether the errors prejudiced Staples' right to a fair jury trial. Under the old standard, we begin with whether the prosecutor's statements were gross and flagrant or motivated by ill will and whether the evidence against Staples was so overwhelming that the error likely had little weight in the jurors' minds. *Tosh*, 278 Kan. at 93. Generally, statements that are gross and flagrant or motivated by ill will violate established rules, emphasize improper points, are repeated, are planned or calculated, or are made with indifference to a court's ruling. *Akins*, 298 Kan. 592, Syl. ¶¶ 7-8. The record doesn't show any of these things in this case. The prosecutor's statement that Staples watched K.C. occurred only once; it did suggest that Staples had a plan when there was no evidence of one, but it simply wasn't gross, flagrant, or motivated by ill will. It was a reasonable inference from the evidence that Staples and K.C. had been at the same pool party and that K.C. had been swimming. Likewise, the "wham, bam, thank you, ma'am" statement wasn't gross, flagrant, or motivated by ill will. It was obviously in direct response to the defense's timeline argument, and while the prosecutor may have gotten somewhat carried away, it wasn't repeated or deliberate.

The third *Tosh* factor is whether the evidence against Staples was so overwhelming that the errors likely had little weight in the jurors' minds. *Sherman*, 305 Kan. at ___, 378 P.3d at 1073. The strongest evidence against Staples was K.C.'s testimony and the forensic evidence: Staples' DNA was found on K.C.'s left breast. But what we find more relevant here is how minor the prosecutor's alleged errors were— indeed, we have hesitated to even call them errors. The statement about "watching" did imply that Staples had planned his actions, but it happened only once as part of an argument that established how Staples knew K.C. And the prosecutor then immediately characterized the crime as one of opportunity, not premeditation. The "wham, bam, thank you, ma'am" statement was no more than a minor overstep in an argument that was a direct response to the defense's timeline argument. We don't find it likely that either

16

weighed heavily in the jurors' minds. After all, the jury acquitted Staples of the rape charge. So under the old standard, Staples' conviction isn't reversible based on prosecutorial misconduct.

The new standard simplifies the second step of this analysis from the three *Tosh* factors to the straightforward constitutional harmless-error test: has the State shown that the prosecutor's errors were harmless beyond a reasonable doubt? 305 Kan. at ___, 378 P.3d at 1075. In other words, is there any reasonable possibility that the errors contributed to the verdict? 305 Kan. at ___, 378 P.3d at 1075. In this case, there isn't. The prosecutor only once suggested that Staples had been watching K.C., thereby suggesting a motive or plan. But just two sentences after the "watching" statement, the prosecutor characterized Staples' actions as an opportunistic crime, not a premeditated one: "[H]e saw an opportunity and he took it. Why did he do that? Because he could. Because it was there." We cannot say that the single suggestion of motive or plan (which itself may have been a reasonable inference based on the evidence), followed immediately by a description of the crime as opportunistic, affected the jury's verdict. Next, the prosecutor said "wham, bam, thank you, ma'am" to describe how quickly sexual actions can occur. While it wasn't the best choice of words, it really didn't fit the facts of this case, anyway, and it was the only time that the prosecutor made such a statement; she otherwise described Staples' actions specifically according to the evidence and without any off-color characterizations. We cannot say that this prejudiced the jury, either. Finally, even when we consider both statements together, it's not a reasonable possibility that the prosecutor's alleged and isolated errors—suggesting that Staples had been watching K.C. and describing quick sexual acts with an off-color phrase—affected the jury's verdict. Once again, the jury acquitted Staples of the rape charge, suggesting that these comments had no impact on its deliberations.

So, under either standard, there's no reversible error in this case because even if the statements were improper, there's no reasonable possibility that they contributed to the verdict.

III. *We Cannot Determine Whether the District Court Abused Its Discretion When It Denied Staples' Motion for a Shorter Sentence, So We Will Vacate the Sentence and Remand for Resentencing.*

Staples argues that the district court made two mistakes in sentencing him. First, he says that the district court abused its discretion when it denied his motion to depart from the controlling prison sentence and impose a shorter sentence, and second, he says that the district court shouldn't have imposed lifetime postrelease supervision.

We review the district court's denial of a departure motion for an abuse of discretion. *State v. Randolph*, 297 Kan. 320, 336, 301 P.3d 300 (2013). As we said earlier, a district court abuses its discretion if its decision is based on an error of law or fact or if no reasonable person could agree with its decision. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

The sentences for most crimes in Kansas are based on a grid that provides a range of months in prison based on the severity of the crime and the defendant's criminal-history score. See, *e.g.*, K.S.A. 2015 Supp. 21-6804. But some Kansas crimes are off-grid, meaning the district court will impose a sentence that isn't based on the grid. See, *e.g.*, K.S.A. 2015 Supp. 21-6627. Off-grid sentences are generally indeterminate (rather than for a specific time period), such as life in prison with no possibility of being released on parole for a particular number of years. See, *e.g.*, K.S.A. 2015 Supp. 21-6627.

Staples was convicted of aggravated indecent liberties with a child, which is generally an on-grid, severity-level-3 felony. K.S.A. 2015 Supp. 21-5506(c)(2). But under what is known in Kansas as Jessica's Law, it becomes an off-grid crime if the

18

defendant is 18 or older and the victim is under 14. K.S.A. 2015 Supp. 21-5506(c)(3); K.S.A. 2015 Supp. 21-6627(a)(1)(C).

Staples didn't have any criminal history, so his score was I, and his on-grid sentence would have been 55 to 61 months in prison—about 5 years. See K.S.A. 2015 Supp. 21-6804. But because Staples was over 18 and the victim was under 14, the district court was required to sentence Staples to the off-grid sentence—life in prison with no chance of parole for 25 years—unless it found "substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure" to the on-grid sentence. K.S.A. 2015 Supp. 21-5506(c)(3); K.S.A. 2015 Supp. 21-6627(c)-(d)(1). Substantial means something of substance, not imagined or fleeting, and compelling implies that the court is forced by the facts of the case to go beyond what is ordinary. *State v. Jolly*, 301 Kan. 313, 326, 342 P.3d 935 (2015).

When deciding whether to depart from the off-grid sentence, a court can consider various mitigating circumstances, including those listed in K.S.A. 2015 Supp. 21-6627(d)(2), such as whether the defendant has no significant criminal history. But even if mitigating factors exist, the district court isn't required to depart. *State v. Beaman*, 295 Kan. 853, 865, 286 P.3d 876 (2012).

Our Supreme Court set out in *Jolly*, 301 Kan. at 324, the process that a district court should use in considering a request for departure from the presumptive lifetime prison sentence called for under Jessica's Law:

> "[T]he proper statutory method when considering a departure from a Jessica's Law sentence is for the district court first to review the mitigating circumstances without any attempt to weigh them against any aggravating circumstances. Then, in considering the facts of the case, the court determines whether the mitigating circumstances rise to the level of substantial and compelling reasons to depart from the otherwise mandatory sentence. Finally, if substantial and compelling reasons are found for a departure to a

19

sentence within the appropriate sentencing guidelines, the district court must state on the record those substantial and compelling reasons."

Here, Staples presented evidence on several mitigating factors: he has no criminal history, he did not violate the conditions of his bond while awaiting trial, he registered as a sex offender as required by his conviction, he has a strong employment history, he has never been accused of a sex crime before, he has supportive family and friends, and he provides financial and emotional support for his wife and two kids. The district court didn't dispute the truth of Staples' assertions; it simply reviewed each of them and found, one by one, that they weren't substantial and compelling.

Staples argues that the district court made a mistake of law because it considered the mitigating factors one at a time rather than all together. It appears that Staples is correct that the court should consider the mitigating factors together: "The important question is whether [the] mitigating factors *together* create substantial and compelling reasons." *Beaman*, 295 Kan. at 866. Although no similar statement is found in *Jolly*, there is no contrary statement either, and *Beaman* was not one of the cases overruled in *Jolly*. See 301 Kan. at 322-23. We conclude, then, that a district court should consider all the mitigating factors together when determining whether the defendant has shown cause to grant a departure sentence.

The transcript of the sentencing hearing does show the district court going through each of Staples' mitigating factors, one by one. But there is never any indication that the court considered whether the factors—taken together—might be substantial and compelling reasons to depart.

The court found that two of these factors weren't mitigating. Specifically, the court noted that Staples' good behavior while out on bond was simply what the court expected; it wouldn't have put him on bond if it thought he would violate that bond. It next noted

20

that registering as a sex offender wasn't mitigating either because Staples was required by law to register. The court then moved on to factors that were somewhat mitigating, even though they weren't expressly listed in the statute, and found that they weren't substantial and compelling either. First, the court said that having steady employment is nothing more than what society asks of its members. Next, the court said that it didn't doubt that Staples' friends and family supported him or that he was a good dad who supported his family emotionally and financially. But the court said that part of being a good dad is not molesting your kids' friends, and it didn't find those mitigating factors to be substantial or compelling. The court then moved to Staples' lack of criminal history, a statutory mitigating factor, and likewise didn't find that it was sufficiently substantial or compelling to justify a departure.

To be sure, the district court's one-by-one approach shows its careful consideration of each of the mitigating factors that Staples presented. But we are concerned that the district court may have made a legal error by not realizing that it still should have considered whether the mitigating factors—taken together—provided a substantial and compelling reason to depart. If the district court's decision was based on a legal error, of course, that would be an abuse of discretion.

Jessica's Law sentences are obviously severe punishments, and intentionally so. The legislature has determined that these crimes deserve severe punishment. Given the severity of the sentence, though, and the fact that sentences, once made, cannot be changed, we think it important to be sure that such a sentence has been made only after proper consideration of the factors the sentencing court is required to take into account. That may well already have happened here, but we cannot be certain from this record. We therefore vacate Staples' sentence and remand for resentencing.

Staples raises one other issue regarding his sentence, and because this issue might arise again on resentencing, we must also address it. In addition to sentencing Staples to

21

lifetime imprisonment with no chance of parole for 25 years, the court also ordered lifetime postrelease supervision. Staples argues that this portion of the sentence is illegal because the district court can't impose lifetime postrelease supervision following an indeterminate, off-grid prison sentence. As the State concedes, Staples is correct on this point. Whether a sentence is illegal is an issue of statutory interpretation, and we owe no deference to the district court on this question. *State v. Cash*, 293 Kan. 326, 330, 263 P.3d 786 (2011).

A defendant who is released from prison is generally subject to some kind of supervision after release, and this case turns on the distinction between two different kinds of such supervision. For on-grid crimes, Kansas calls this "postrelease supervision," meaning that a defendant has been released after fully serving a sentence and is now serving a period of additional court-ordered supervision. 293 Kan. at 330 (quoting *State v. Ballard*, 289 Kan. 1000, 1014, 218 P.3d 432 [2009]). But for off-grid, lifetime sentences, "parole" follows a release from prison because any release from a lifetime sentence is an early release that has been deemed appropriate by a parole board, not ordered by the court. 293 Kan. at 330 (quoting *Ballard*, 289 Kan. at 1014).

Here, the court imposed a sentence of life in prison *and* lifetime postrelease supervision. This was a mistake. A district court cannot simultaneously sentence a defendant to life in prison while also ordering lifetime postrelease supervision because a life sentence presumes that the defendant will be in prison for life and therefore won't ever be released and subject to *post*release supervision. See 293 Kan. at 330-331. If Staples is ever released from prison, it will be because the parole board granted his release subject to parole conditions. 293 Kan. at 330; see also *State v. Killings*, 301 Kan. 214, 246, 340 P.3d 1186 (2015).

The sentence entered by the district court is vacated, but the district court's judgment is otherwise affirmed. The case is remanded for resentencing.